**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Richard A. TROST, Defendant–Appellant.**

**No. 97–4204.**

United States Court of Appeals,
Seventh Circuit.

Argued May 29, 1998.

Decided Aug. 17, 1998.

is regarded as a classic.

ton's summer of 1959 rendition, however, is regarded as a classic. of 1959 rendition, however,

Ranley R. Killian, Jr. (argued), W. Charles Grace, Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

Floyd E. Crowder, Timothy A. Gutknecht (argued), Crowder & Scoggins, Columbia, IL, Frederick J. Hess, Lewis, Rice & Fingersh, Belleville, IL, for Defendant–Appellant. ·

Before CUMMINGS, RIPPLE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Prior to being carted off to federal prison in December 1997, Richard A. Trost was the elected county clerk and recorder of Monroe County, Illinois, a post he held since 1966. In December of 1995 Trost was charged in a 17–count federal indictment with mail fraud in violation of 18 U.S.C. § 1341; money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(j); and theft from an entity receiving federal funds in violation of 18 U.S.C. § 666. The indictment also contained a forfeiture count pursuant to 18 U.S.C. § 982. In August 1997 District Judge William D. Stiehl heard the case without a jury and found Trost guilty of all but one of the charges. Trost was sentenced to 50 months imprisonment, to be followed by 3 years of supervised release. He was ordered to make restitution to Monroe County in the amount of $100,123.71. In addition, his assets were

found forfeitable in the amount of $57,412 with his residence forfeitable up to the amount of $22,000. He appeals the conviction and the order of forfeiture.[1]

Trost's activities came to light when Eugene Schorb, an outside auditor of Monroe County, uncovered irregularities in the way the clerk's office was handling funds. What Schorb outlined in a report for the county board was a scheme in which, for instance, Trost made it look like various checks were written (and paid) to a computer supplier when in fact the checks were never delivered to that supplier. Rather, Trost made out identical checks to himself but with check numbers 100 higher than those allegedly written to the supplier. Amazingly, he then used a pen to alter the check numbers on the bank statements to make it look as if the checks to the computer supplier were the ones which were cashed when actually he cashed the ones made out to himself. At the time Schorb discovered and outlined the scheme, he thought the missing funds came to $14,000. When Trost was confronted with the report at a special meeting of the board, he admitted that he had no innocent explanation of the events. Immediately after the meeting Trost told the state's attorney that he would repay the money, which he did the next day.

However, as might be expected after this revelation—and almost certainly not just because the sheriff and he were of different political parties, as Trost would have us believe—an investigation was begun with the involvement of both the Monroe County state's attorney and the United States Attorney, under the supervision of an assistant United States attorney. As part of the investigation, two search warrants were executed, one for the clerk's office and one for Trost's home.

The investigation uncovered another scheme and other missing funds to the tune of $100,000. Under this scheme Trost allowed those patrons of the clerk's office who regularly made photocopies of documents to run up a tab and to be billed for their copies, usually on a monthly basis. Trost maintained control of this billing system. He gave each customer a control number; then on a routine basis he sent out bills. He instructed those who delivered the mail in the office to bring all of it to his desk. He then personally opened the mail and took out checks that were sent as payment for copies made on the clerk's office machine. The rest of the mail was then distributed to the appropriate deputy clerks. If Trost was absent from the office, the mail, with the exception of certain filings that the deputies could recognize, remained unopened until his return. If customers wished to pay at the time they made copies, or if the monthly bill was paid in person rather than by mail, a deputy clerk would deposit the payment into an official, legitimate county account.

But the official county account did not receive the payments which were mailed in. Those were deposited into an account at the State Bank of Waterloo—the Richard A. Trost "Special Account," account number 120456. Illinois law allowed clerks to set up special accounts, but this one, while bearing some trappings of official special accounts, also was significantly different from what one would expect of special accounts. The account bore the defendant's home address and his social security number, rather than the office address in the Monroe County Courthouse and the county's taxpayer identification number. Into this account went both checks payable to Trost in his official capacity for copies and unauthorized transfers from other county accounts as well as from payments from the state for election judges. Trost used the special account to pay personal debts. He often transferred funds from legitimate county accounts to the special account and from there to his joint account with his wife. For whatever reason, the bank did not become suspicious, and the county auditor knew nothing of the account.

---

1. After oral argument in this case, Trost filed a motion to strike certain statements made by the government lawyer at argument concerning the financial recordkeeping and funding for Monroe County and the clerk's office. Any such statements pertinent to our consideration of this case involve matters of public record or items which appear in some form in the record of this case. The motion is therefore denied.

Trost seems to acknowledge that there was something wrong with what he did, but he maintains in this appeal that whatever was wrong does not add up to mail fraud, money laundering, nor embezzlement from an entity receiving in excess of $10,000 in federal funds. He also attacks the forfeiture and contends that the evidence obtained from the search warrants should have been suppressed.

■ Relying on *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), Trost argues that he is not guilty of mail fraud because the mailings were not for the purpose of executing the scheme and that the use of the mails was part of his duties as county clerk and recorder of deeds, performed in the ordinary course of business. He emphasizes that in *Parr*, the Court determined that the mail fraud statute did not apply to a situation in which school board members converted real estate tax payments received through the mails. Trost analogizes his situation to that in *Parr* and claims that he was "required and lawfully entitled to assess and collect the fees." He argues that the Court "has ruled that such mailing of legitimate bills for legitimate fees pursuant to the imperative of duty and then converting the checks received in the mail for payment of those bills does not constitute use of the mails under 18 U.S.C. § 1341."

His argument is based on an overly simplistic comparison of his situation to *Parr* and a failure to acknowledge later explications of the *Parr* holding. In the relevant portions of *Parr*, the Court considered whether the use of the mails to distribute tax bills and to receive payments of those bills—payments which were brazenly misappropriated by the seven members of the school board after they were received—constituted mail fraud. The Court determined that the mailings were not for the purpose of executing a scheme to defraud. The school board was under "an express constitutional mandate to levy and collect taxes for the acquisition of facilities for, and to maintain and operate, the schools of the District...." At 387, 80 S.Ct. 1171. It was required by statute "to issue statements for such taxes and to deliver receipts upon payment." At 387, 80

S.Ct. 1171. In addition, there was no evidence that the tax bills were inflated to cover the losses. Furthermore, the board was collecting taxes, in part, from nonresident property owners and thus was "required by the state law to use the mails." At 388, 80 S.Ct. 1171. In *Parr*, the government had argued, in fact, that the board could not collect the taxes "without the use of the United States Mails." Thus the question in the case was whether "the legally compelled mailings of the lawful ... letters, tax statements, checks and receipts, ... properly may be said to have been for the purpose of executing a scheme to defraud...." At 389, 80 S.Ct. 1171. In reaching its conclusion that they could not, the Court emphasized that it was deciding the issue based "on the particular circumstances" of the case. The money would come to the district coffers through the mail regardless of what the defendants did. Their crimes occurred after the money legitimately arrived in the district accounts. The crimes committed by the *Parr* defendants included embezzlement, misappropriation, and theft, but not mail fraud.

In a later case, *Schmuck v. United States*, 489 U.S. 705, 714–15, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), the Court placed a limit on the *Parr* holding. It said:

To the extent that Schmuck would draw from these previous cases a general rule that routine mailings that are innocent in themselves cannot supply the mailing element of the mail fraud offense, he misapprehends this Court's precedents. In *Parr* the Court specifically acknowledged that "innocent" mailings—ones that contain no false information—may supply the mailing element. 363 U.S., at 390, 80 S.Ct. 1171. In other cases, the Court has found the elements of mail fraud to be satisfied where the mailings have been routine.

The relevant consideration is always "whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time...." At 715, 109 S.Ct. 1443.

In Trost's case, as to counts 1 through 4 (the fees for photocopies) the mailing was clearly part of the scheme—in fact, the scheme would not have worked without mailings. The use of the mails allowed Trost to

circumvent the clerk's office accounts altogether and funnel the money to his "special account."

Trost's argument that the copy fees were legitimate fees which he was required to collect and that the circumstances required him to use the mails is unconvincing. It is true that he was authorized by statute to collect the fees. 55 ILCS 5 4–4001 specifically authorizes clerks to collect fees for copies, though it does not require it. However, there was no practical necessity in this case—as there was in *Parr*—to use the mails. In *Parr* the property tax bills were required to be distributed to every property owner in the district. The property owners were not people who would routinely come to the school board meetings, where if they happened to be there they could be handed a bill. Short of personally delivering all the bills to the owners, there was nothing to be done but mail them. In addition, some of the taxpayers were absentee owners, making personal delivery even more ridiculous an idea. Here, the only people billed for copies are those who either personally or through an agent went to the clerk's office to obtain copies. Even though it is routine for some clerks in Illinois to mail out bills for such services, there is no reason either legally or practically that billing would be necessary. Some persons, in fact, paid at the counter, either the immediate charges or the bill which they had received. The problem from Trost's point of view with over-the-counter payment is that he could not circumvent the legitimate county bank accounts if his deputy clerks received the money. The use of the mails was a crucial element of his scheme to channel the money around the office to the special account.

Which brings us to another distinction between the two cases. In *Parr* the funds were deposited in official district accounts. Then the money, with help from various defendants who were bankers, was withdrawn from the accounts, for instance, by use of checks made out to fictitious persons; the checks were cashed by the bank without endorsements. Here, of course, the account was made to look to the bank like an official account, but in large part it was used for Trost's personal benefit. The county did not even know the account existed. Trost did not merely embezzle from existing official accounts, though he did that too; rather, he used the mails to funnel the money to what really turned out to be, practically speaking, a phony account.

■ Count 5 is a little more troublesome and a little more like *Parr*. While we see a difference between this count and the previous counts, neither Trost nor the government makes any significant attempt to discuss those differences. Trost merely argues that all the mail fraud counts involve official, innocent, legitimate mailings and that all of them fail under *Parr*. The government says the counts involve allegations constituting mail fraud because Trost used the mails and manipulated the delivery of mail to further his scheme.

Count 5 involves payments from the state to the county for elections judges. The evidence shows that each time there is an election the State Board of Elections sends forms out to county clerks in counties such as Monroe where there is no separate Board of Election Commissioners. The county clerk fills in the number of judges that were used in the election and returns it. The State Board pays the county clerk $10 per judge. The mailings were official, routine, and, in a practical sense, far more necessary than the mailings involved with the photocopy fees. They were consistent with mailings to other counties; they were generated by the state. Trost did not, in any real sense, cause the mailings.

The events set out in count 5 are, however, almost a serendipitous addition to his scheme. As long as he controlled the delivery of mail and the checks came through the mail directly to him, he might as well put them in his "special account." And therein lies the crucial difference between the events alleged in count 5 and the *Parr* case. Trost manipulated the mail delivery to his office so that he could prevent the payments from landing in official county accounts. He did not let these particular routine payments run their course, be placed in legitimate accounts, and then embezzle from county accounts; he manipulated the mails to allow him to get at

the money before the county knew about it. The events set out in count 5, while a little different from those in counts 1 through 4, appropriately constitute mail fraud.

■ Trost also argues that the evidence is insufficient to sustain his conviction on counts 13 through 16, in which he is charged with embezzling over $5,000 per year for the years 1991 through 1995 from an entity (Monroe County) which received in excess of $10,000 in federal funds per year, in violation of 18 U.S.C. § 666. His argument is that one must embezzle from the precise entity which receives the funds. He says he was not an agent of Monroe County, but rather a constitutional officer of the state. It was the county which received the money, not his office. Therefore, he says he cannot be convicted of a violation of § 666. We'd like to say that he stops short of arguing that to be convicted of embezzling he must be found to have embezzled the exact funds which came from the federal government, but, alas, he makes this argument, too. He also contends that because he is statutorily required to turn over to the county the county funds he receives, and the funds at issue had not yet been turned over to the county, he cannot be convicted of embezzling county funds. We hardly know where to begin our discussion.

The first thing to be said is that the latter two arguments are completely unavailing. His argument that the clerk's office and the county are separate entities and the federal money was distributed to the county is somewhat better. But not good enough. The Illinois statutes show that in counties such as Monroe the clerk must turn over the money he collects to the county treasury. 55 ILCS 5 4–13001. It is, relatively speaking, a small county. His department is not sufficiently independent for us to require that the federal funds come directly to the clerk's office for the statute to apply. *See United States v. Grossi*, 143 F.3d 348 (7th Cir.1998). For purposes of § 666, Trost is an agent of the entity which receives the federal money. *See Salinas v. United States*, — U.S. —, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997); *United States v. Grubb*, 11 F.3d 426 (4th Cir.1993).

■ Trost also contends that his conviction on the money laundering counts must be reversed, first because, once the mail fraud and embezzlement counts are dismissed, there will be no predicate offense on which to base the counts, and secondly because his actions did not involve concealment or disguise. We have disposed of the first argument. The second depends on the trial judge's interpretation of the facts. In general terms, what the evidence shows is that Trost took the checks which came through the mail; deposited them in a phony but legitimate looking county account over which he had absolute control, an account that the county knew nothing about; then, on occasions set out in the indictment, transferred funds to a personal account he held jointly with his wife; then, for instance, wrote a check on the joint account to pay a residential loan in his name and that of his wife. We cannot label as clearly erroneous the finding that Trost had a purpose to conceal the true source of the money. And it appears, in fact, that he successfully covered his trail for several years. His argument that his name was on the "special account" and therefore there was no concealment is disingenuous at best. The argument might have some force if the account had been allowed to look like a personal account in Trost's name or if he had paid his home mortgage with a check directly from that account. The account was in his name but in a manner designed to convince the bank that it was a "special" county account where he would be authorized to deposit the county money which poured into it. The arrangement apparently prevented the bank from becoming suspicious while also successfully hiding the money from the county. Trost's challenges to his money laundering convictions are unconvincing.

■ Judge Stiehl also ordered a forfeiture of $57,412, but Trost argues that the appropriate sum, assuming we uphold his convictions, is only $23,000, the amount he was specifically convicted of laundering in the five money laundering counts. He also concedes that the court can order the forfeiture of Trost's interest in the family residence up to $22,000 and that it may seek substitute assets to cover the remaining $1,000. At trial the government first sought forfeiture of

$114,424.93, the entire amount of money which was transferred though · account 120456. Later, however, it was stipulated that because the amount stated in the indictment was $104,000, that figure would cap the forfeiture judgment.

The judge arrived at the forfeiture sum ordered by adding up all the illegally procured money which Trost was convicted of obtaining in counts 1 though 16 and then setting off amounts which had been counted twice.

The issue now is whether $57,000 is properly forfeited, not whether the judge could have ordered forfeiture of more. *United States v. Bajakajian*, —— U.S. —— n. 11, 118 S.Ct. 2028, n. 11, 141 L.Ed.2d 314, n. 11 (1998). The statute allows forfeiture of amounts which are involved in money laundering. Interpreting § 981, the civil forfeiture statute, we have affirmed forfeitures even as we were cautioning that involved in has limits: illegal funds are not like "a drop of ink falling into a glass of water," thus discoloring an entire bank account. *United States v. $448,342.85*, 969 F.2d 474 (7th Cir. 1992). The cautionary language does not carry the day for Trost. In his case, we have a bottle of ink diluted by a drop of water.

Trost's "special account" had an almost totally illicit purpose. Judge Stiehl found beyond a reasonable doubt that Trost used the account to launder money embezzled from the county. He found that the account was used to facilitate the crimes of which Trost was convicted and that significantly more than $23,000 was funneled through the account to conceal or disguise the true nature of his activities. Furthermore, he found that there was no evidence that the use of the funds was bona fide or justified.

■ Given those findings we are convinced that a forfeiture in the amount of $57,000 is well within acceptable parameters. Money does not need to be derived from the crime to be forfeited. *United States v. $448,342.85*. It can be forfeited if it is involved in the crime. Sometimes, in fact, legitimate funds might be used to disguise illegitimate funds. Here, however, there is no argument that any of the money was legitimate. Rather, there is evidence that $94,561.42 in the ac-

count was stolen. The amount of the forfeiture clearly includes money involved in the crime, as required by 18 U.S.C. § 982.

■ Finally, Trost argues that he was subjected to two illegal searches. He contends that the first search was carried out in a manner which violated Rule 41 of the Federal Rules of Criminal Procedure and that the second search was, therefore, tainted as well. The alleged violation of Rule 41 is that a state officer applied for the warrant and the execution of the warrant took place without a federal official present. In addition, the return was not made in a timely manner. Such events could violate Rule 41(d), which requires that the return "shall be made promptly," and Rule 41(a), which says in part:

> Upon the request of a federal law enforcement officer or an attorney for the government, a search warrant authorized by this rule may be issued (1) by a federal magistrate judge, or a state court of record within the federal district, for a search of property or for a person within the district. . . .

The facts show that the warrant in this case was applied for by a state policeman and Sheriff Kelley. On the other hand, an affidavit by an assistant United States attorney accompanied the request; it stated that the case would be prosecuted in federal court and named the assistant United States attorney who would be prosecuting it. At the time the warrant was executed, the federal agent who was to be involved in the search was unexpectedly called away to investigate a bank robbery, and thus no federal official was present for the first search. Finally, the return was made 29 days later but, we should also note, it was made in conjunction with the return from the second search.

If, in fact, these events add up to violations of Rule 41, a question we need not decide, the violation would not be prejudicial nor would there be an intentional disregard of the rule. *See United States v. Burke*, 517 F.2d 377 (2nd Cir.1975). They are not the sort of violations which would cause us to change the course we charted in *United*

*States v. Hornick,* 815 F.2d 1156 (7th Cir. 1987), where we said:

> It should be clear after *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), that technical defects in a warrant do not call for or permit exclusion of what the search produces. Judge Friendly's thorough opinion in *United States v. Burke,* 517 F.2d 377 (2d Cir. 1975), discusses the extent to which suppression of evidence is the proper response to violations of Rule 41. Our own cases, roughly contemporaneous with *Burke,* say that foibles in the administration of Rule 41 are not grounds for exclusion. *United States v. Jones,* 518 F.2d 384, 387–88 (7th Cir.1975); *United States v. Harrington,* 504 F.2d 130 (7th Cir.1974). In light of *Leon,* it is difficult to anticipate any violation of Rule 41, short of a defect that also offends the Warrant Clause of the fourth amendment, that would call for suppression. Many remedies may be appropriate for deliberate violations of the rules, but freedom for the offender is not among them.

There being no reason to suppress evidence from the first search means that there is no reason to consider suppressing evidence obtained from the second one. The motion to suppress was properly denied.

The government also argues that Trost does not have standing to object to the first search of his office. We have not decided the issue on this basis because the argument has been raised for the first time on appeal. *See United States v. Thompson,* 944 F.2d 1331 (7th Cir.1991), *cert. denied,* 502 U.S. 1097, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992). However, the issue reveals the case in a microcosm. In order to assert that the evidence should be suppressed, Trost must necessarily be asserting an expectation of privacy in the evidence seized from his office, particularly in the bank records of the "special account." Is that an acknowledgment that he viewed it as a personal account? Furthermore, we would have to agree that Trost ran his office in a manner so as to demand privacy. Even his deputy clerks were not allowed to see some of the documents which came through the mail. But

demanding secrecy to carry out illicit activities is not the same as having a legitimate expectation of privacy for purposes of the Fourth Amendment.

Trost's was a public office charged with keeping public records. Illinois statutes require:

> Custody of records; public inspection. The county clerk shall have the care and custody of all the records, books and papers appertaining to and filed or deposited in their respective offices, and the same, except as otherwise provided in the Vital Records Act, shall be open to the inspection of all persons without reward.

55 ILCS 5/3–2012. In the reply brief, Trost's attorneys argue that the search of Trost's office should not be compared to ordinary office search cases. Maybe not, but the argument put forth is exactly upside down. The difference Trost sees is that as "an elected official" he somehow has a right to more, not less, privacy despite the fact that his office is a repository of **public** records.

In what must be one of the most amazing lines ever set out in a brief, Trost's attorneys ask, "Would Mr. Starr be able to search the Oval Office without a search warrant?" Putting aside how lopsided that comparison is, and ignoring that here there was, in fact, a warrant, we are dumbstruck by the comparison, made, as it is, on behalf of a public official charged with the keeping of public records. If Mr. Trost himself approves of the question asked, perhaps that explains how he got into his present predicament. The conviction and the forfeiture are affirmed.