UNITED STATES of America,
Plaintiff,

v.

Everette O. BAKER, Defendant.

No. 97–CR–30079–WDS.

United States District Court,
S.D. Illinois.

Oct. 21, 1999.

Stephen B. Clark, Assistant U.S. Attorney, Fairview Heights, IL, for plaintiff.

Charles Shaw, Clayton, MO, Douglas Roller, St. Louis, MO, for defendant.

### MEMORANDUM & ORDER

STIEHL, District Judge.

This matter is before the Court for ruling on Count 23 of the Superseding Indictment which seeks forfeiture of real and personal property involved in the offenses charged in Counts 1–22 of the Superseding Indictment. The defendant was convicted after trial by jury on the charges in each of Counts 1–22. Both the defendant and the government waived trial by jury on Count 23 and have submitted the matter to the Court on briefs. The government seeks forfeiture from the defendant in the amount of $7,575,900.24, less construction costs, plus certain real estate, as set forth in the Superseding Indictment. The defendant, in turn, asserts that the government is only entitled to forfeiture in the amount of $2,590, which correlates to the actual amounts of certain credit card transactions specified in the Superseding Indictment.

### BACKGROUND

The defendant was charged by the grand jury with money laundering (Counts 1–15), engaging in a monetary transaction in property derived from a specified unlawful activity (Counts 16–20 and 22), and conspiracy to commit money laundering (Count 21). These charges all arose from the defendant's ownership of certain massage parlors that promoted prostitution in violation of Illinois law, 720 ILCS 11–14; 11–17; 8–2; and 5–2(c).

Specifically, the Superseding Indictment charged, and the evidence established, that at all times relevant to the indictment, the defendant was the primary owner, investor, and controller of several business known as: American Printing and Publishing, Co.; Fantasy Massage Parlor; Fantasy Massages; Fantasyland Massage Parlor; Fantasyland Theater and Arcade; Fantasy Land Night Club; and Bettye's

Touch Above, also known as Bettye's Top Hat and Bettye's Brown Sugar. The evidence established, and the jury found by its verdict that the defendant kept Fantasy Massage Parlor, Fantasyland Massage Parlor and Bettye's Touch Above as places of prostitution. The evidence further established that the defendant operated and ran the businesses at Fantasy Land Night Club (a topless night club) and Fantasyland Theater and Arcade (an adult video store and adult bookstore) in the same building as the Fantasyland Massage Parlor and in conjunction with the other places of prostitution. During the period from 1989 to 1994, the defendant ran a massage parlor/prostitution business out of a trailer located in Brooklyn, Illinois, under the names of Fantasy Massage Parlor and Fantasy Massages. In 1992, defendant began to build the Fantasyland complex which was financed by the proceeds from the massage parlors and a loan from the DuQuoin State Bank. In 1994, the Fantasyland Massage Parlor opened. In 1995, the defendant added an adult bookstore and video arcade to the complex. In 1996, the defendant opened the Fantasyland Night Club.

The government proved that as part of the defendant's prostitution business, he would deposit money realized from that business in certain bank accounts maintained in the name of American Printing and Publishing, specifically, Account No. 0006940101 (the credit card account) and Account No. 0000024109 (the cash account), both maintained at Magna Bank of Illinois. These deposits were derived from cash, credit card sales drafts, credit card electronic funds transfers, and ATM transactions, which constituted the proceeds of prostitution activities in violation of Illinois law, including prostitution, keeping a place of prostitution, and conspiracy to keep a place of prostitution. The government established that American Printing and Publishing was little more than a "cover" or "front" through which the defendant laundered the prostitution proceeds.

## A. *The Fantasyland Sex–Mall*

The evidence established that the customers at the massage parlors received sexual favors in exchange for payment by either cash or credit cards. The overwhelming testimony presented at trial was that the primary, if not sole, purpose of the massage parlors during the period alleged in the Superseding Indictment was to provide sex for profit. The evidence revealed that the common practice was that the massage parlor manager would "rent" a room to a customer for a certain period of time for a certain sum. The "room rental" and the massage fee were paid to the massage parlor manager. Once in the room, the customer would make arrangements with the masseuse for the sexual services desired, and payment in the form of a "tip" would be made directly to the masseuse/prostitute for the sexual service. The tip amount would often equal the massage fee.

During the period when the massage parlor accepted credit cards, the customers could charge the room rental and massage fees and the tip for the masseuse/prostitute. It was clear, however, that the preferred method of payment was cash for each of those costs. This is further evidenced by the defendant's business decision to install an ATM machine in the massage parlor in 1995. Soon thereafter he stopped accepting credit card charges. Due to the cash-based nature of this business, the Court is persuaded that the amount of money generated by the massage parlor business which the government has been able to trace through deposits into the defendant's banking accounts, does not represent one hundred percent of the income the defendant generated through his massage parlor/prostitution business. Although there was evidence that there were times when no sexual service was actually provided, it was clear that this occurred only on rare occasions.

The defendant, in an obvious attempt to insulate himself from prostitution-related charges, held meetings where he would "warn" the masseuses that they were not to engage in sexual activities with the customers. There were even "rules" posted in the massage parlor to the effect that sexual behavior was prohibited, and the customers and masseuses were required to sign an agreement that no sexual services were to be provided. The defendant, on occasion, fined the masseuses for engaging in prostitution and even fired or suspended a few masseuses for this activity. The fines, however, were slight, and the "fired" masseuses were soon reinstated. The evidence clearly established, and the jury found, that the federal charges all arose from the defendant's involvement in the illegal activity which occurred at the massage parlor, e.g. the promotion of prostitution and prostitution related crimes.

As part of the sex business, between 1994 to 1996 the defendant established the Fantasyland complex, which, in addition to sex, provided a full compliment of related businesses, including a topless nightclub, an adult book and an adult video store. All were designed to foster the customer's interest in the sex for sale at the massage parlors. As Art Feole, himself a former manager of several topless nightclubs testified, the massage parlors were located in close proximity to the topless nightclubs to take advantage of the "traffic" provided by the topless nightclub customers. Feole testified that patrons of the nightclubs were drawn to the massage parlors and patrons of the massage parlors were drawn to the nightclubs. It was clear that the Fantasyland complex was designed to provide a total package of sex-related services, from x-rated videos and books, to topless dancers and prostitution services, a sex mall, if you will.

## B. *The Financial Gains*

The evidence was that defendant's income was largely derived from the operation of the massage parlors, and that without the income from the parlors, the defendant would not have been able to build the Fantasyland complex. The gov-

ernment established that the $904,733 used to construct the complex was financed by the massage parlor proceeds which, in part, had been deposited into the two Magna accounts. Although advised by his accountant to separate his businesses in order to partition the "legitimate" parts of the real estate, e.g. the topless nightclubs, the adult bookstore and the adult video store, from the massage parlor, the defendant did not do so. Moreover, he routinely commingled the profits from the nightclub and the video and book stores with the massage parlor profits. The businesses owned by the defendant were essentially operated as one intertwined enterprise where the defendant commingled the proceeds from all three portions of the business into the same Magna Bank accounts, held staff meetings for the masseuses in all three locations, and had massage parlor receipts delivered to his office in the nightclub, and to the bookstore. Money from the Magna Bank accounts was used to pay both personal and business related expenses.

Between January 1990, and December 1995, the massage parlor accepted credit cards in payment for prostitution services. In May of 1995, the defendant, keeping up with modern times, and for the convenience of the customers, installed an ATM machine in the Fantasyland massage parlor and adjacent topless nightclub. In January of 1996, the defendant stopped accepting credit cards at the massage parlor, and in January of 1997, moved the ATM machine from the massage parlor to the "legitimate" side of the Fantasyland complex. At that time, if a customer of the massage parlor did not have sufficient cash to pay for the desired sexual services, he would be directed by the masseuses and shift managers to the Fantasy Land Night Club or the Fantasyland Theater and Arcade to use the ATM machines. After using these machines, the customers would then return to the massage parlor with the cash they had just obtained from the ATM machine, pay for the room, massage, and sex service. It was clear from the evidence that the room rental rate (usually hourly) was at a higher than normal rate given the location of the room and the short "rental" period.

In January of 1997, the government executed search warrants at the defendant's businesses and seized voluminous documents and items. Anticipating the forthcoming indictment, the defendant transferred management of Fantasy Massage Parlor in April 1997 to his son and codefendant Edward Everette Johnson, doing business as Gateway Metro, Ink. Johnson continued the prostitution business, under the guidance and direction of his father, until September of 1997, when the first indictment was returned.

As part of the operation of the prostitution business from 1990 to 1995, the defendant, or his employees or agents, used the wires in interstate commerce to obtain credit approval from a credit card clearing house for customers who used their credit cards to obtain prostitution services. In addition to depositing checks and credit card transaction receipts into the Magna bank accounts, the defendant then issued checks on those accounts to pay bills, including payments to Aviston Lumber in the amount of $15,000, Rodgers Heating and Cooling in the amount of $7,700, Crane Agency Company in the amounts of $2,760 and $4,685, and Banking Equipment Service, Inc in the amount of $2,008.12. In addition, funds were drawn from these accounts, *inter alia*, to make payroll on various occasions, to make payments on a $201,855 commercial loan to the DuQuoin State Bank, and an automobile loan on defendant's Series 600 Mercedes Benz automobile. The defendant also used this same Mercedes Benz automobile to pick up the receipts from the massage parlors and from the Fantasyland Theater and Arcade during the period from January 1996 through April 1997. During the period covered by the indictment, the total amount deposited into the business bank accounts was $9,339,094.99, less transfers to other accounts, plus deposits into a re-

lated business account, for a total of $9,248,793.71. The defendant filed tax returns for the period in question, indicating a total net income during this period of $1,323,678.

In short, the defendant created a large and profitable prostitution business in the Brooklyn, Illinois area. All of the defendant's businesses were dependent upon the success of the massage parlors. The defendant successfully, until his conviction, laundered large sums of illegally obtained funds through his legitimate businesses and bank accounts.

### DISCUSSION

The defendant has been convicted of fifteen counts of money laundering, one count of conspiracy to commit money laundering and six counts of engaging in a monetary transaction in property derived from a specified unlawful activity.

■ To sustain the charge of money laundering under 18 U.S.C. § 1956, "the government needed to show that [the defendant] conducted a financial transaction affecting interstate commerce with property representing the proceeds from some illegal activity, that he knew that the property represented illegal proceeds, and that he conducted the transaction with the intent of promoting the unlawful activity." *United States v. Emerson,* 128 F.3d 557, 561 (7th Cir.1997); 18 U.S.C. § 1956.

■ To sustain the charge of engaging in a monetary transaction in property derived from specified unlawful activity, the government had to prove that the defendant knowingly engaged in or attempted to engage in a monetary transaction; that the monetary transaction involved criminally derived property of a value greater than $10,000; and that the criminally derived property was derived from specified unlawful activity. 18 U.S.C. § 1957.

■ To sustain the offense of conspiracy to commit money laundering, the government was required to prove that the alleged conspiracy to commit money laundering existed; that an overt act was committed in furtherance of the conspiracy to commit money laundering; and that the defendant knowingly and intentionally became a member of the conspiracy to commit money laundering. *Emerson,* 128 F.3d at 561; *United States v. Rodriguez,* 53 F.3d 1439, 1444 (7th Cir.1995)

■ The forfeiture statute in question, 18 U.S.C. § 982(a)(1), provides, in pertinent part: "The Court, in imposing sentence on a person convicted of an offense in violation of section ... 1956[or] 1957 ... of this title, *shall* order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." (Emphasis added.) Once a defendant has been convicted, the burden of proof for criminal forfeiture is only a preponderance of the evidence. *United States v. Herrero,* 893 F.2d 1512, 1541 (7th Cir.1990).

The defendant asserts that the forfeiture sought in this case is an effort by an overzealous government to obtain enormous amounts in federal forfeiture for what are purely state crimes of prostitution. In support of this, the defendant cites language in *United States v. Montague,* 29 F.3d 317, 318 (7th Cir.1994), and *United States v. Griffith,* 85 F.3d 284, 287–88 (7th Cir.), *cert. denied,* 519 U.S. 909, 117 S.Ct. 272, 136 L.Ed.2d 195 (1996). In both of these cases, the Seventh circuit recognized that this type of case "demonstrates how an aggressive United States Attorney can use the money laundering statute as a means to take over from state prosecutors the prosecution of long-established state crimes and, in the process, secure more draconian sentences and increase the population of the already overcrowded federal prisons." *Montague,* 29 F.3d at 318, *quoted in Griffith,* 85 F.3d at 287.

However, the defendant fails to quote the following language in *Griffith* recognizing the validity of the money laundering statute:

But, it is not our function to critique statutes—either alone or in combination.

Congress, which, of course, is the statutory font, recently rejected an attempt by the Sentencing Commission to tie sentences for money laundering to sentences for the underlying criminal conduct. This approach would have reduced the sentences imposed in cases like this one. This refusal by Congress to adopt an ameliorative measure indicates an intent to impose strict punishment for money laundering, even when it is associated with relatively minor underlying offenses.

85 F.3d at 288. Clearly, although the underlying crime of prostitution is a state offense, the federal money laundering statute is valid and applicable in this case, and forfeiture is proper under § 982, and does not amount to an excessive fine.

## A. *Forfeiture Issues*

The defendant would have the Court find that because the charges in Counts 1–15 involve allegations that the defendant knowingly conducted a financial transaction, that it is the credit card approval for customer purchases of prostitution services that constitutes the "specified unlawful activity." He argues that any forfeitable amount would be limited to the amount involved in the interstate credit card clearing procedures. He claims that to be forfeitable, the "unlawful activity" must involve federal law, not state law, and the only federal connection is the use of credit cards. The defendant then asserts that the amount of the clearing procedures proven, and thus subject to forfeiture, is $2,590, which is the total of the amounts alleged in the substantive money laundering counts.

### 1. *Specified Unlawful Activity*

The Court cannot, however, under the applicable statute, find that the government is limited to forfeiture of only those specific transactions which involved a credit card clearing house, particularly because the defendant was not simply charged with money laundering, he was also charged with conspiracy to commit money laundering. The defendant's interpretation of the term "specified unlawful activity" is simply too narrow a reading of the applicable statutes, which would render the provisions of § 982 a nullity. *United States v. Kirschenbaum,* 156 F.3d 784, 790 (7th Cir. 1998).

In order to determine the proper reading of the term "specified unlawful activity," under both the money laundering and financial transactions provisions, the Court must look to the other statutory provisions which are included within § 1956 and § 1957. Section 1956 provides that "specified unlawful activity" includes "any act or activity constituting an offense listed in section 1961(1)...." Included in the listed offenses of § 1961(1) is the offense of racketeering under § 1952. Section 1952(b) provides, in pertinent part: "As used in this section (i) 'unlawful activity' means (1) ... prostitution offenses in violation of the laws of the State in which they are committed or of the United States...." Section 1957(f)(3) provides: "the term 'specified unlawful activity' has the meaning given that term in section 1956 of this title." In *Montague,* 29 F.3d at 322, the court held that "the Missouri prostitution statute forms the basis for a violation of § 1952, which is a type of racketeering activity listed in § 1961, and is a specified unlawful activity designated in the money laundering statute—§ 1956." Therefore, the "specified unlawful activity" which underlies the money laundering charges in this case is the prostitution-related activities in violation of Illinois state law, not merely the credit card transactions which paid for the prostitution services.

### 2. *The Bank Account Amounts*

■ Applying the plain language of theses statutes, it is clear that the defendant is subject to forfeiture of that property "involved in" or "traceable to" the prostitution activities which underlie the charges in the indictment, and not merely to the amounts of the credit card transactions which were alleged in Counts 1–10 to

have passed through a credit card clearing house. As the court stated in *United States v. Trost*, 152 F.3d 715, 721 (7th Cir.1998) *cert. denied*, 525 U.S. 1070, 119 S.Ct. 802, 142 L.Ed.2d 663 (1999):

> The statute allows forfeiture of amounts which are involved in money laundering. Interpreting § 981, the civil forfeiture statute, we have affirmed forfeitures even as we were cautioning that involved in has limits; illegal funds are not like "a drop of ink falling into a glass of water," thus discoloring an entire bank account.

*Id.* at 721,*quoting United States v. $448,-342.85*, 969 F.2d 474 (7th Cir.1992). Much like the accounts in *Trost*, here the evidence clearly established that "the account[s were] used to facilitate the crimes of which [the defendant] was convicted," 152 F.3d at 721. By virtue of the defendant's use of these accounts, the total amount traceable to or involved in the conspiracy to commit money laundering is subject to forfeiture.

As the court also stated in *Trost*, 152 F.3d at 721, "Money does not need to be derived from the crime to be forfeited. It can be forfeited if it is involved in the crime." In *Trost*, the defendant argued that the government was limited to forfeiture of only the specific amounts set forth in the individual counts of money laundering. The court rejected this argument, finding that, "[Property] can be forfeited if it is involved in the crime. Sometimes, in fact, legitimate funds might be used to disguise illegitimate funds." *Id.* Here, the defendant clearly used the two Magna accounts Account No. 0006940101 (the credit card account) and Account No. 0000024109 (the cash account) and the "legitimate" parts of the Fantasyland complex to launder the proceeds of the prostitution business he ran out of the Fantasyland Massage parlor. Unlike the accounts in *$448,342.85*, 969 F.2d 474, these accounts were used by the defendant to launder significant amounts of money derived from the illegal prostitution business, more like the "bottle of ink

diluted by a drop of water" recognized by the court in *Trost.*

The government was only required to prove that the credit card charges provided the customers "with the opportunity to engage in [sex]." *United States v. Campione*, 942 F.2d 429, 434 (7th Cir.1991). The evidence adduced at trial was that the customers at the defendant's massage parlors received sex in exchange for either credit card payments, or for cash. Despite the defendant's contention that there were "legitimate" portions of the massage parlor revenues, the overwhelming evidence was that the amounts paid by the customers was not for the "use" of a room in any conventional sense, but rather was a lightly veiled process in which the defendant facilitated the lucrative prostitution business by "renting" rooms to customers. As noted earlier, the room "rental" fee was clearly excessive for the time and amenities provided.

The defendant asserts that the credit card use and the use of the ATM's were only incidental to the prostitution, and that there were legitimate uses of the credit cards. He further argues that ATM transactions were not part of the prostitution services and should not be subject to forfeiture. However, as previously detailed, the evidence at trial was that the primary purpose of implementing the credit card system, and later the ATM machines, was to facilitate the payment for the room rental for prostitution services.

The evidence at trial revealed that the defendant used the Magna accounts to pay bills, payroll and other expenses, and that there were transfers made from Account No. 0006940101 to Account No. 0000024109. Clearly, the funds in both of these accounts were "involved in" the underlying state offense of the enterprise of the conspiracy, i.e. to keep a place of prostitution. The defendant clearly used these bank accounts to "promote, manage, establish, and carry on" the illegal prostitution business as part of the conspiracy to commit money laundering. Therefore, the Court **FINDS** that it is proper to forfeit the amount of money "involved in" or

"traceable to" the conspiracy to commit money laundering during the period alleged in the indictment, January 1990, through November 1997.

The government seeks to forfeit not only the amount of proceeds received by the defendant as a result of the prostitution services and facilitation of prostitution, but all of the proceeds of the Fantasyland complex, including the income from the "legitimate" portions of defendant's businesses. The government, in its generosity, notes that although the defendant's deposits totaled more than 9 million dollars, the government only seeks forfeiture in the amount of $7,575,900.24, less the construction costs of $904,733, for a total amount of $6,674,267.24. The defendant asserts that if the Court finds the amounts which went into the accounts to be forfeitable, the Court should hold a hearing to determine what constitutes "proceeds" under § 982. Citing *United States v. Masters,* 924 F.2d 1362, 1369–70 (7th Cir.1991) (a RICO forfeiture case in which the Seventh Circuit stated that forfeiture is proper as to "net, not gross revenues"), the defendant argues that the Court may only forfeit gross receipts less expenses, and must take into account legitimate income, loan proceeds, depreciation allowances and the like. The Court notes, however, that the parties agreed to submit the forfeiture issue to it on briefs, and further notes that based on the pleadings and the evidence adduced at trial, it has before it a sufficient record to determine the amounts subject to forfeiture.

Therefore, the Court finds the monetary amounts to be forfeitable are as follows:

**MONEY LAUNDERING COUNTS:**

| | |
|---|---|
| COUNT 1 | $ 5,845.00 |
| COUNT 2 | 7,000.00 |
| COUNT 3 | 5,000.00 |
| COUNT 4 | 7,000.00 |
| COUNT 5 | 9,000.00 |
| COUNT 6 | 5,760.00 |
| COUNT 7 | 10,000.00 |
| COUNT 8 | 7,000.00 |
| COUNT 9 | 8,677.00 |
| COUNT 10 | 13,500.00 |
| COUNT 11 | 15,000.00 |
| COUNT 12 | 7,700.00 |
| COUNT 13 | 2,760.00 |
| COUNT 14 | 4,685.00 |
| COUNT 15 | 2,008.12 |
| TOTAL | $110,935.12 |

**MONETARY TRANSACTION COUNTS:**

| | |
|---|---|
| COUNT 16 | $ 30,000.00 |
| COUNT 17 | 11,616.99 |
| COUNT 18 | 10,963.92 |
| COUNT 19 | 11,338.81 |
| COUNT 20 | 11,242.07 |
| COUNT 22 | 20,000.00 |
| TOTAL | $ 95,211.79 |

for a total amount forfeitable on Counts 1–20 and 22 of $206,146.91. In addition, the Court **FINDS** that in light of the defendant's conviction on Count 21 for conspiracy to commit money laundering, the total amount of the massage parlor proceeds for the period of January 1990, through November 1997, are forfeitable. These amounts are:

| | |
|---|---|
| 1990 | $ 482,960.00 |
| 1991 | 764,724.00 |
| 1992 | 642,156.00 |
| 1993 | 597,744.00 |
| 1994 | 773,231.00 |
| 1995 | 1,212,813.00 |
| 1996 | 599,572.00 |
| 1997 | 239,629.00 |
| TOTAL | $5,312,829.00 |

This total amount includes the specific amounts forfeitable from the defendant's convictions on Counts 1–20 and 22. The Court, to avoid double counting, will not add these amounts to the total amount forfeitable under Count 21. The Court specifically **DECLINES** to forfeit those amounts attributable to the adult bookstore, video store, and nightclub.

In addition, the Court **FINDS** that it is appropriate to reduce the total monetary amount forfeitable by the amount of $904,733, which represents the construction costs for the Fantasyland complex, and further, as conceded by the government, by $504, which represents a payroll check issued in April of 1997 to Edward Johnson and deposited in one of defendant's accounts. This results in a total monetary amount forfeitable of $4,407,592.

### 3. The Real Estate

■ As stated earlier, the defendant began construction on the Fantasyland complex in 1992, and opened the massage parlor located there in 1994. The complex grew to include an adult book store and video arcade, added in 1995, and a topless nightclub, added in 1996. The construction of the complex was financed with the proceeds of illegal prostitution. Counts 15–20 of the Superseding Indictment involve the use of large sums of money from the prostitution business to pay off the $201,855 loan the defendant had with the DuQuoin State Bank.

The government seeks forfeiture of the entire Fantasyland complex, while the defendant asserts that because some legitimate business occurred there, the entire project is not subject to forfeiture.

In light of its finding that proceeds of the massage parlor/prostitution illegal revenues were used to fund the construction of the Fantasyland complex, the Court **FINDS** by a preponderance of the evidence that the entire complex is subject to forfeiture.

### 4. Substitute Assets

Section 982(b)(1)(A) provides that criminal forfeiture of property under § 982(a)(1) is governed by the provisions of 21 U.S.C. § 853(c), (e)–(p). Subsection (p) provides that substitute assets may be forfeited when the properly directly involved has been transferred, sold to or deposited with a third party.

The Court **FINDS** that the government may be entitled to forfeiture of substitute assets after the Court determines the rights of any third parties in the property sought to be forfeited.

### CONCLUSION

It is therefore the **FINDING** of the Court by a preponderance of the evidence that the defendant is **GUILTY** of Count 23 of the Superseding Indictment. Accordingly, pursuant to 18 U.S.C. § 982.

The Court **ORDERS FORFEITED** as a personal monetary judgment against the defendant Everette O. Baker the amount of $4,407,592. The Court **ORDERS** that this judgment may be enforced as a regular monetary judgment against Everette O. Baker.

The Court **FURTHER ORDERS FORFEITED** all rights, title, and interest of the defendant Everette O. Baker, in the real estate described in paragraph 83(h) of the Superseding Indictment (known as the Fantasyland complex). The property is described as follows:

> The real estate, and any interest in any trust for said real estate, located in Brooklyn, Illinois, more fully described as follows:
>
> Lots No. 174, 175, 176, 177, 201, 202, 207, and 224 in Block No. 16 in the "Town of Brooklyn"; reference being had to the Plat thereof recorded in the Recorder's Office of St. Clair County, Illinois, in Book of Deeds "I" on pages 348 and 349, situated in St. Clair County, in the State of Illinois.

The Court **FURTHER ORDERS FORFEITED** all rights, title and interest of

the defendant Everette O. Baker in the real estate described in paragraph 83(i) of the Superseding Indictment. The property is described as follows:

The real estate located in Brooklyn, Illinois, more fully described as follows:

Lot No. 208 in Block No. 16 in the "Town of Brooklyn"; reference being had to the Plat thereof recorded in the Recorder's Office of St. Clair County, Illinois, in Book of Deeds "I" on pages 348 and 349, situated in St. Clair County, in the State of Illinois.

**IT IS SO ORDERED.**