In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1269

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RUBEN HUGHES,

Defendant-Appellant.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 CR 670-01--Harry D. Leinenweber, Judge.


Argued December 3, 1999--Decided May 3, 2000



Before POSNER, Chief Judge, and COFFEY and MANION,
Circuit Judges.

COFFEY, Circuit Judge.  Defendant-Appellant Ruben
Hughes ("Hughes") was indicted and charged in
Count one with conspiring to possess cocaine and
cocaine base with intent to distribute, in
violation of 21 U.S.C. sec. 846, in Counts two
through five with distributing cocaine or cocaine
base, in violation of 21 U.S.C. sec. 841(a)(1),
and in Count six with possessing a firearm as a
felon, in violation of 18 U.S.C. sec.
922(g)(1)./1 At the conclusion of a jury trial,
Hughes was found guilty on each of the counts,
and on January 13, 1999, the court imposed a life
sentence on the drug counts,/2 as well as a ten
year concurrent term on the firearm count and a
$10,000 fine. Hughes appealed, alleging that the
evidence presented at trial constructively
amended the indictment and that the trial judge
erred when he refused to give the multiple
conspiracies jury instruction the defendant
requested. Hughes also claims that his attorney
failed to adequately discuss the contents of the
Presentence Report ("PSR") with him in violation
of Federal Rule of Criminal Procedure
32(c)(3)(A), and also challenges the sentencing
judge's findings relating to the quantity of
drugs that he was responsible for as well as his
leadership role in the crimes. AFFIRM.

I.  BACKGROUND

In 1989, Hughes began acting as the leader of a cocaine trafficking operation in the Joliet-Lockport, Illinois area. The drug operation was run primarily from a series of "crack houses" in an area of Joliet referred to as the "Hill." His organization consisted of a confederation of people who prepared cocaine base ("crack") by cooking cocaine powder into crack, bagged the crack for resale and distributed it to customers at Hughes' direction. During the period charged in the indictment ("[b]eginning in 1996 and continuing until on or about June 26, 1997"), Hughes managed and directed his operation from his crack house at the "Hill" called the "Bolo Shop," which sold approximately 4.5 to 9 ounces of crack daily, resulting in an income of $5,000 to $10,000 per day, mainly from the volume sale of "quarter bags" (bags containing between .1 and .3 gram of crack) costing $20 to customers. All monies collected from the sales were given to Hughes, with each worker receiving a small commission either in money or crack. Hughes was never far away from the scene of the sales, and when the workers ran out of their supply, they paged Hughes who would in turn deliver a fresh supply of crack and collect the money. The defendant amassed some 29 vehicles, several houses as well as a car wash from his lucrative cocaine operation.

With Hughes as the star of the show, the cast of characters included two long-time acquaintances who were employed in his operation and later agreed to testify against him--namely, Joseph Nixon ("Nixon") and Jeffrey Lindsey ("Lindsey"). A long-time customer, Kendall Woods ("Woods"), also testified for the government against Hughes.

Nixon began selling drugs for Hughes in 1990. As time progressed, Hughes took him under his wing and soon thereafter Nixon became his "right hand man," selling and "bagging" the crack for him. By 1997, Hughes was allowing Nixon to bag and sell multi-ounce quantities of crack for a $5 profit on every $20 bag sold. Although Hughes' "Bolo Shop" crack house was raided and shut down by the police in January 1997, between January and June 1997, Nixon bagged, sold and delivered in excess of five kilograms of crack for Hughes.

Lindsey at one time was also designated to sell and cook cocaine into crack base for Hughes, and like the other employees, he was given "quarter bags" to sell and would also page Hughes to pick up the proceeds when a replenishment of drugs was needed. On occasion, Hughes would give Lindsey between 6 and 8 grams of crack for every kilogram cooked for him. In the summer of 1996 alone, Lindsey cooked an estimated total of six to ten kilograms of crack for Hughes./3

Woods had known Hughes for some ten years before he began purchasing cocaine and crack from him in 1989. From that time until 1997, Woods made cocaine and crack buys from Hughes over 500 times, in quantities ranging from 3.5 grams to half a kilogram. After Woods' arrest for drug possession and aggravated battery, he agreed to cooperate with law enforcement authorities in the investigation of Hughes. Between January and June of 1997, Woods made four monitored drug buys from Hughes which serves as the basis for Counts two through five of the indictment./4

Hughes' drug operation crumbled when he was involved in a traffic accident on June 26, 1997, and an Illinois State trooper named Linda Terando investigated the accident and was informed by a motorist at the scene that the defendant had deposited a red rag in a culvert off the side of the road. Trooper Terando recovered the red rag and discovered that it contained two Grendel handguns./5 As a result, the defendant was arrested for possessing a firearm as a felon./6

On December 18, 1997, a federal grand jury indicted both Hughes and Nixon in Count one of the charging papers with conspiring to distribute cocaine and cocaine base and in Counts two and five with cocaine and cocaine base distribution, and also indicted Hughes alone in Count three and four with cocaine distribution and in Count six with possessing a firearm as a felon. Likely sensing the strength of the government's case against him, Nixon agreed to assist the government and pled guilty to Count one and became a cooperating witness. Testifying against Hughes at trial, Nixon described how since 1990, he had been personally involved in the processing and delivery of dozens of kilos of cocaine and crack for Hughes, and described in detail the nature of his and Hughes' involvement in the drug operation. Nixon also testified that he helped "cook" cocaine on occasion, but mainly bagged and sold $20 bags of crack to customers from a number of Hughes' crack houses. He also testified that from January through June 1997, he delivered crack to Woods at Hughes' direction. Likewise, Woods testified about the extensive amount of cocaine and crack he had purchased from Hughes since 1989, as well as the details of the 1997 drug transactions during the government sting operation. Lindsey as well testified about the extensive amount of cocaine that he cooked into crack and sold for Hughes.

A jury found Hughes guilty on all counts set forth in the indictment. At sentencing, Hughes objected to the four-level upward adjustment of his offense level from 40 to 44 for his

leadership role in the crimes and the quantity of cocaine attributable to him as recommended in the PSR. Hughes also stated at the sentencing hearing that his counsel "never really sat down and discussed" the PSR with him, thus violating Federal Rule of Criminal Procedure 32(c)(3)(A), but his counsel rebutted this testimony. The sentencing judge rejected Hughes' objections to the PSR, adopted its recommendations and sentenced Hughes to life imprisonment on Counts one through five, and a ten year term of imprisonment on Count six, ordered to run concurrently. The defendant appealed.

## II. ISSUES

On appeal, the defendant claims that the district court committed reversible error in: (1) allowing the evidence of his uncharged criminal activity to, in effect, constructively amend the indictment; and (2) failing to issue the requested multiple conspiracies jury instruction. Hughes also challenges the computation of his sentence, arguing that: (1) his attorney failed to adequately discuss his PSR with him prior to sentencing; (2) the judge failed to make adequate findings relating to the quantity of cocaine base attributable to him; and (3) the judge erred in adjusting his offense level upward for his leadership role in the crimes.

## III. DISCUSSION

### A. Hughes' Challenges to His Conviction

1. Constructive Amendment of the Indictment

On appeal, Hughes argues that the evidence at trial relating to his drug activity referred to conduct that occurred prior to the period set forth in the indictment ("[b]eginning in 1996 and continuing until on or about June 26, 1997"), and thereby constructively amended the indictment. We note that the trial record reflects that the defendant failed to object either before or during trial to this specific evidence./7 Thus, he has forfeited his challenge to the evidence of his uncharged drug activity and the plain error standard governs./8 See Wilson v. Williams, 182 F.3d 562, 568 (7th Cir. 1999) (en banc).

Under the plain error standard, only "those errors which 'seriously affect the fairness, integrity or public reputation of judicial proceedings'" warrant reversal. See United States v. Akinrinade, 61 F.3d 1279, 1283 (7th Cir. 1995) (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)). In other words, plain error is "an error that not only is clear in retrospect but also causes a miscarriage of justice." See Wilson, 182 F.3d at 568. Thus, Hughes must

establish not only that "there was error, [but] that error was plain, that error affected his substantial rights, and that it seriously affected the fairness, integrity, or public reputation of the proceeding." United States v. Bursey, 85 F.3d 293, 296 (7th Cir. 1996) (emphasis added) (citing United States v. Olano, 507 U.S. 725, 730-37 (1993)).

Hughes essentially contends that the aggregate of the testimony of Nixon, Lindsey and Woods regarding their pre-1996 involvement in his drug operation denied him a fair trial by constructively amending his indictment to include uncharged drug activity. This Circuit has previously held that under the plain error review standard, the constructive amendment "must constitute a mistake so serious that but for it the defendant probably would have been acquitted in order for us to reverse." United States v. Cusimano, 148 F.3d 824, 828 (7th Cir. 1998) (alterations and quotations omitted).

But, "[t]he introduction of evidence of pre-conspiratorial events[,] does not by itself create a constructive amendment to the indictment." See id. at 829; United States v. Spaeni, 60 F.3d 313, 315 (7th Cir. 1995). "[T]his circuit has a well-established line of precedent which allows evidence of uncharged acts to be introduced if the evidence is 'intricately related' to the acts charged in the indictment." See United States v. Gibson, 170 F.3d 673, 680 (7th Cir. 1999). In other words, a "court may admit evidence of other criminal conduct that is inextricably intertwined with the charged offense or that completes the story of the charged offense." United States v. King, 126 F.3d 987, 995 (7th Cir. 1997).

Essentially, the admissibility of uncharged criminal activity under the "intricately related" doctrine turns on:

whether the evidence is properly admitted to provide the jury with a complete story of the crime on trial, whether its absence would create a chronological or conceptual void in the story of the crime or whether it is "so blended or connected" that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of, the charged crime.

United States v. Ramirez, 45 F.3d 1096, 1102 (7th Cir. 1995) (alterations and citations omitted).

Thus, it seems quite apparent that the evidence presented by the government served the very appropriate and useful purpose of allowing the jury to gain a more complete understanding of the

vast scope and nature of Hughes' drug operation, including the locations, participants, duties and assignments of the workers and operational structure of the drug operation, as well as the inner workings of the drug conspiracy and the nature and extent of Hughes' control. In other words, the testimony completed "the story of the crime or crimes charged" and was "necessary to enable the jury to fully understand and make sense of the" various drug transactions and scenarios. See Gibson, 170 F.3d at 682.

Moreover, the testimony describing Hughes' pre-1996 drug activity was directly relevant to establishing a foundation for the personal knowledge of the government witnesses, as well as the veracity of their testimony. The nature and circumstances surrounding the relationships between Nixon, Lindsey, Woods and Hughes, directly impacted on the question of the veracity and strength of the testimony of each of the prosecution's witnesses, as well as serving to establish their direct involvement in and knowledge of Hughes' participation in the crimes. In United States v. Zarnes, 33 F.3d 1454 (7th Cir. 1994), we similarly upheld the admissibility of such pre-indictment criminal activity evidence:

The sale was an integral part of the first meeting between Zarnes and the Nietupskis. The testimony showed how their relationship began, its basis, and structure, and how the relationship blossomed into the charged conspiracy. The evidence was "intricately related" to the conspiracy, and, as such, was admissible . . . .

Zarnes, 33 F.3d at 1469 (citation omitted) (emphasis added).

In short, the testimonial evidence concerning Hughes' pre-1996 drug trafficking organization and activity, "gave the jury a more, not less, accurate picture of the circumstances" surrounding the charged crimes. See Ramirez, 45 F.3d at 1103; see also Akinrinade, 61 F.3d at 1286 ("The evidence concerning the smuggling procedures employed by the trafficking organization before the time of the charged conspiracy was properly admitted to show the relationships of the co-conspirators, and how the heroin operation functioned. In short, this evidence gave the jury an accurate picture of the charged crime."); United States v. Diaz, 994 F.2d 393, 395 (7th Cir. 1993) (holding that the facts relating to the unindicted criminal activity "showed that the charged conspiracy existed by showing how the conspiratorial relationship between Gonzalez and Diaz developed. This

testimony established how the conspirators came to know each other, how they established a relationship of trust through their associations and how these events flowered into the charged conspiracy."). Thus, it is also evident that the probative nature of this evidence outweighed any prejudice that might have resulted because the presentation of this evidence was necessary and "intricately related to the facts" of the defendant's charged offenses./9 See United States v. Hargrove, 929 F.2d 316, 320 (7th Cir. 1991) ("Here the testimony of Hargrove's arrest was intricately related to the facts of the case. It related directly to Hargrove's participation in the charged conspiracy and was consistent with other evidence adduced at trial. Any prejudice from this testimony resulted solely from its tendency to link Hargrove to the conspiracy and was not unfair."). We reject the defendant's claim that the indictment was constructively amended,/10 and consequently, conclude that there was no error, much less plain error, in allowing the jury to hear a more complete recitation of his drug activity.


2.  Multiple Conspiracies Jury Instruction

Next, the defendant contends that the trial judge should have issued a multiple conspiracies instruction./11 But it is interesting to note that even the defendant acknowledges in his Appellant Brief that the proposed multiple conspiracies instruction his counsel submitted to the court was in a form that has been deemed legally defective by this Court. ("We realize that this Court has deemed this instruction legally defective.") Although the defendant claims that "[l]egal inadequacy in [the] proposed instruction should not foil appellate relief," the prevailing caselaw clearly dictates otherwise. We note that this Court has held on numerous occasions and without equivocation that an erroneous instruction should not be given. See United States v. Wilson, 134 F.3d 855, 865 (7th Cir. 1998); United States v. Duff, 76 F.3d 122, 126 (7th Cir. 1996). Further, with an improper jury instruction before it, "under the 'intricately related doctrine,' the court is not required to give a limiting instruction [such as a multiple conspiracies instructions] at the time of the admission of evidence or as part of the charge to the jury." Cusimano, 148 F.3d at 829. Moreover, because a court's role is not to assist either party in the litigation of their case, it is the duty and responsibility of each respective counsel to be adequately prepared and thus have complete knowledge of the facts of the case as well as the applicable caselaw when submitting proposed jury instructions to the court. See

generally Wilson, 134 F.3d at 865 ("A defendant is entitled to an instruction on his theory of defense [i.e., multiple conspiracies] only if . . . the proffered instruction is a correct statement of the law." (emphasis added)). Thus, because "the court has no duty to offer an instruction sua sponte" on behalf of a defendant, Cusimano, 148 F.3d at 829, as well as the fact that a "defendant is entitled to an instruction on his theory of defense only if . . . the proffered instruction is a correct statement of the law," Wilson, 134 F.3d at 865, we conclude that the trial judge properly denied the defendant's legally defective instruction. See also United States v. Kelly, 167 F.3d 1176, 1178 (7th Cir. 1999) (stating that "we review a trial court's instructions to the jury with great deference"); United States v. Powers, 75 F.3d 335, 341 (7th Cir. 1996) ("The district court has substantial discretion with respect to the specific wording of instructions."). Cf. United States v. Townsend, 924 F.2d 1385, 1389 (7th Cir. 1991) ("[T]he jury's verdict must be interpreted as a finding that the government presented sufficient evidence to prove its indictment beyond reasonable doubt, and that is all that we require of the prosecution. The fact that the government's evidence might also be consistent with an alternate theory is irrelevant; the law does not require the government to disprove every conceivable hypothesis of innocence in order to sustain a conviction on an indictment proved beyond reasonable doubt. Consequently, 'even if the evidence arguably establishe[d] multiple conspiracies, there [is] no material variance from an indictment charging a single conspiracy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment.'") (alterations in original) (citations omitted)./12

B.  Hughes' Challenges to his Sentence

     A.  Federal Rule of Criminal Procedure 32

     The defendant also claims that he is entitled to a remand of his sentencing because of his contention that his counsel failed to adequately discuss the PSR with him./13 We review the sentencing court's factual findings for clear error. See United States v. Isirov, 986 F.2d 183, 185 (7th Cir. 1993).

     Under Federal Rule of Criminal Procedure 32(c)(3)(A), "before imposing sentence, the court must . . . verify that the defendant and defendant's counsel have read and discussed the presentence report." At this sentencing hearing, it is clear from the record that the judge in

fact asked both Hughes and his counsel if they had read the PSR, if they discussed it, and if they wished to challenge anything else in the report:

THE COURT: Let's start out this way: Mr. Mottweiler [(the defendant's counsel)], have you read all the documents that I have outlined that I have?
MR. MOTTWEILER: Yes.
THE COURT: Have you discussed them with your client, Mr. Hughes?
MR. MOTTWEILER: I have. In fact, some of the documents were forwarded to me by Mr. Hughes.
THE COURT: Mr. Hughes, have you read all these documents I have talked about?
THE DEFENDANT: Yes.
THE COURT: Specifically, you have read the presentence report and the addendum, is that right?
THE DEFENDANT: Yes.
THE COURT: You have discussed them with your lawyer, Mr. Mottweiler, is that right?
MR. MOTTWEILER: We have discussed them, Judge.
THE COURT: Is that right, Mr. Hughes?
THE DEFENDANT: Nope.
THE COURT: You say you have not discussed these with your lawyer at all, is that right?
THE DEFENDANT: Nope. He just showed me the objections he filed to the PSI.
THE COURT: Did he ask you whether or not the reports were accurate or not accurate as to your background and your family, for example?
THE DEFENDANT: He asked me--he said he was going to check and see if all my arrests were right. He asked me about that but we never really sat down and discussed about the PSI.
THE COURT: Let me ask you this: Is there anything inaccurate about any of this? Leave out the issues that we are talking about.
THE DEFENDANT: Yes.
THE COURT: What is inaccurate?
. . .
MR. MOTTWEILER: Maybe a more fitting question might be: Is there anything inaccurate other than noted in the objections?
. . .
THE COURT: Is there anything else inaccurate in this report?
. . .
THE DEFENDANT: All right. The stuff as far as dealing with the trial is inaccurate.
. . .
MR. MOTTWEILER: He objects to everything that relates to the factual recitation of the facts in the trial.
THE COURT: In other words, the offense conduct he objects to?
MR. MOTTWEILER: Yes.
THE COURT: One of the issues is whether he was an

organizer and leader of the sale.
MR. MOTTWEILER: There is very little that we have
not objected to, just for the record.

(Tr. 1/13/99, at 4-5.)

It is interesting to note that this Court
considered this same issue in United States v.
Knorr:

Federal Rule of Criminal Procedure 32(a)(1)(A)
requires that prior to sentencing, the district
court "determine that the defendant and
defendant's counsel have had the opportunity to
read and discuss the presentence investigation
report." We have construed this as requiring the
court at sentencing to obtain the answer to three
questions: 1) whether the defendant has had an
opportunity to read the presentence report; 2)
whether the defendant and the defense counsel
have discussed the report; and 3) whether the
defendant wishes to challenge any facts contained
in the report. Rone, 743 F.2d at 1174.

At the sentencing hearing, the district court
posed the proper questions as enunciated in Rone.
Knorr indicated that he had an opportunity to
review the presentence report. When asked whether
he had an opportunity to discuss it with his
attorney, Knorr initially answered "no." But then
one of the defense counsel explained that another
of the current defense team had spoken with Knorr
on one occasion and that he had spoken to Knorr
on several occasions by telephone. Knorr then
clarified that while they had discussed the
presentence report, some parts had not been
discussed "in depth." Defense counsel then noted,

[w]e discussed the presentence report, we
discussed strategies as to how to handle his new
case [the failure to appear charge] and how it
impacts on the present proposed sentencing, and
the possible motion to withdraw the guilty plea,
and it must be obvious that I have some facility
with some of those things because of my argument.

Defense counsel noted that he and the defendant
"had a couple of discussions" on the impact of a
specific issue on sentencing. Defense counsel
also indicated that "we have spoken of these
things, [Knorr] and I in an attempt to develop
some direction, and we have not had a chance to
finalize that."
. . .
United States v. Knorr, 942 F.2d 1217, 1222 (7th
Cir. 1991). Considering Knorr's responses posed
to the district court, the contacts he had with
his counsel relating to the PSR, as well as the
objections to the PSR that were formulated with
and submitted through his counsel, we concluded

that there was no violation of Rule 32. See id. at 1223.

With essentially the same facts and arguments that we faced in Knorr, we are convinced that Hughes' counsel adequately discussed the PSR with him within the parameters of Rule 32. We also believe that it is inconceivable that his counsel would have been able to submit the numerous written objections that he did, along with supporting legal memorandum without having discussed the PSR or without input from Hughes; as the defendant's attorney stated at the sentencing hearing, "There is very little that [Hughes has] not objected to." Further, the judge's finding that Hughes' counsel adequately discussed the PSR with him is essentially "based on his decision to credit the testimony of one of two [witnesses] . . ., [and] that finding . . . can virtually never be clear error." Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985). Accordingly, in light of the deference that we necessarily afford sentencing judges in their factual and credibility findings, see United States v. Mancillas, 183 F.3d 682, 701 n.22 (7th Cir. 1999) ("We do not second-guess the [sentencing] judge's credibility determinations. . . .") (alteration in original); United States v. Garcia, 66 F.3d 851, 856 (7th Cir. 1995), we conclude that the defendant has failed to establish a Rule 32 violation. See, e.g., Knorr, 942 F.2d at 1222-23 (rejecting a defendant's claim that Rule 32 was violated when he and counsel allegedly did not have "in depth" discussions relating to the PSR).


B.  Drug Quantity Calculations

Hughes also argues that the sentencing judge made inadequate drug quantity findings. We review a district court's determination of the amount of narcotics attributable to a defendant for sentencing purposes under the clear error standard. See United States v. Johnson, 200 F.3d 529, 537 (7th Cir. 2000). "'The factual findings of the district court will not be overturned unless they are clearly erroneous . . . . Thus, we will reverse the district court's conclusion as to quantity of cocaine attributable to [a] defendant[ ] only if we have a definite and firm conviction that the district court made a clear error in sentencing.'" United States v. Taylor, 72 F.3d 533, 542 (7th Cir. 1995) (quoting United States v. Mumford, 25 F.3d 461, 465 (7th Cir. 1994)).

Incorporating the government's position as well as the recommendations of the PSR, the judge found that the testimony of Lindsey, Nixon, and

Woods relating to Hughes' drug activity and quantities (as well as leadership role in the operation) was truthful, and that their testimony established that Hughes was responsible for at least 1.5 kilograms of cocaine base. As we have previously held, "[d]istrict court determinations of drug amounts are reviewed for clear error, and credibility determinations are given deference so long as support exists in the record." United States v. Garrett, 45 F.3d 1135, 1141 (7th Cir. 1995). Indeed, "[i]n a drug conspiracy, each conspirator is responsible not only for amounts with which he was directly involved, but also for amounts involved in transactions by co-conspirators that were reasonably foreseeable to him." United States v. Paters, 16 F.3d 188, 191 (7th Cir. 1994).

There is ample, and indeed substantial, evidence in the record to support the district court's findings. Nixon testified that between January and June of 1997, he bagged, sold or delivered in excess of five kilograms of crack cocaine for Hughes and at his direction. (Tr. at 199.) Similarly, Lindsey testified that in the summer of 1996, he cooked an estimated total of six to ten kilograms of crack cocaine for Hughes. (Tr. at 547, 549, 551.) Although Lindsey would later recant, then rehabilitate, and then again recant his testimony, the judge found that "I am well-satisfied that his [Lindsey's] testimony given was true during the trial and that his recantation was false . . . . Even if it wasn't, as I said before, there is plenty of evidence roping in Mr. Hughes to all six counts . . . ."

"We have frequently held that the trial judge is in the best position to judge the credibility of witnesses who offer conflicting testimony concerning the quantity of drugs attributable to a defendant for purposes of sentencing." United States v. Pitz, 2 F.3d 723, 727-28 (7th Cir. 1993).

As a matter of sound jurisprudence, we do not second-guess the sentencing judge's credibility determinations because he or she has had the best 'opportunity to observe the verbal and non-verbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements,' as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record. United States v. Tolson, 988 F.2d 1494, 1497 (7th Cir. 1993) (quotation omitted). On numerous occasions, we have held that the clearly erroneous standard applies to estimates of drug quantities made for sentencing purposes because

"the district court, as the trier of fact, not only has the authority but is in the best position to determine the amount of narcotics attributable to the [defendant]." Id. at 1502; see also United States v. Ferguson, 35 F.3d 327, 333 (7th Cir. 1994).

Garcia, 66 F.3d at 856; see Mancillas, 183 F.3d at 701 n.22 ("We do not second-guess the [sentencing] judge's credibility determinations. . . .") (alteration in original).

Based on our review of the record, we are of the opinion that the overwhelming weight of the testimony presented at trial amply supports the district court's finding that Hughes was responsible for the very conservative figure of 1.5 kilograms of cocaine base. We therefore conclude that the judge's findings relating to the amount of drugs attributable to him as "relevant conduct" under U.S.S.G. sec. 1B1.3(a)(2) were "based on evidence possessing sufficient indicia of reliability," see United States v. Howard, 80 F.3d 1194, 1204 (7th Cir. 1996), and thus, were not clearly erroneous.

### C. Aggravating Role Enhancement

Lastly, Hughes claims that the evidence presented at trial was inadequate to support an upward adjustment for his leadership role in the crimes. We review a court's determination of a defendant's role in the offense for clear error. See United States v. Zaragoza, 123 F.3d 472, 483 (7th Cir. 1997). Again, we will not disturb a sentencing judge's factual determinations unless we have a definite and firm conviction that a mistake has been made. See United States v. Brierton, 165 F.3d 1133, 1137 (7th Cir. 1999).

The district court adjusted the defendant's offense level four levels upward based on his leadership role in the crimes pursuant to U.S.S.G. sec. 3B1.1(a). The judge found more than sufficient evidence to establish the requisite number of "subordinates" under sec. 3B1.1(a) ("If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."): "The evidence, I think was even further than that. There were a lot of people who distributed for a resale. So I am going to find he was the organizer and unquestioned leader of the organization, requiring a four level enhancement." We agree. The record clearly supports that Hughes was the leader of an extensive drug operation with numerous employees and participants, including Nixon, Lindsey, the defendant's girlfriend, Kim Robinson, and the

defendant's father, David Hughes, and countless customers, including Woods. See also U.S.S.G. sec. 3B1.1, cmt. (n.3) ("In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered."). In light of our deference to the sentencing judge on factual and credibility issues, see Garcia, 66 F.3d at 856, we conclude that the judge's findings supporting the upward adjustment of Hughes' offense level for his leadership role in the crimes were not clearly erroneous.

VI.   CONCLUSION

We hold that the evidence presented at trial did not constructively amend the indictment and that the trial judge did not abuse his discretion in denying the defendant's multiple conspiracies jury instruction. We further hold that Hughes' counsel adequately discussed the PSR with him prior to his sentencing and that the court's findings in relation to the quantity of cocaine base attributable to his relevant conduct and findings in relation to his leadership role in the crimes were not clearly erroneous. We AFFIRM the defendant's conviction and sentence.

/1 Pursuant to a plea agreement, co-Defendant Joseph Nixon pled guilty to the conspiracy count and became a cooperating witness against Hughes.

/2 As recommended in the Presentence Report, Counts one through five were "grouped together" for sentencing purposes pursuant to U.S.S.G. sec. 3D1.2(d), whereby Hughes was sentenced under "the offense level corresponding to the aggregated quantity" of drugs that was attributed to him. See U.S.S.G. sec. 3D1.3(b). Accordingly, the judge sentenced Hughes to "a total term of life imprisonment on Counts 1, 2, 3, 4 and 5."

/3 Lindsey testified at trial that on one occasion, Hughes and Nixon came over to his house to have him "cook" nine ounces of crack for Hughes, and on another occasion, Hughes directed him to cook a kilogram of cocaine.

/4 All but two of the conversations during that time frame between Woods and Hughes concerning these transactions were recorded by law enforcement agents.

Occurring on January 30 and 31, 1997, the first two buys involved a total of four and one-half ounces of cocaine (101.6 grams of crack and 127.1 grams of cocaine powder). The third buy occurred on February 25, 1997, and involved another four

and one-half ounces (127.1 grams) of cocaine powder. And on June 17, 1997, the fourth buy occurred, involving approximately four and one half ounces (125.7 grams) of cocaine base.

/5 It was later revealed that one of the guns was purchased by Hughes' girlfriend, Kim Robinson, on July 1, 1994, and the other by his father, David Hughes, on September 16, 1993.

/6 Even while housed at the Will County Jail on the gun charges, Hughes was able to continue his drug operation with the assistance of Nixon, his girlfriend, Kim Robinson, and his father, David Hughes.

/7 It appears that Hughes raised a constructive amendment argument in his post-trial motion for a new trial. Nonetheless, for purposes of our review, because no objection was made during trial, we apply the plain error standard of review.

/8 The defendant also argues that his pre-trial motion in limine adequately preserved his challenge to the evidence of his uncharged drug activity for appeal. Even though he moved in limine to preclude twelve items of evidence that are not at issue in this appeal, it is evident from the record that his pre-trial motion failed to include an objection to the admission of evidence of his pre-1996 drug activity. But even if we were to agree with the defendant and generously construe his motion in limine to include an objection to the evidence of his pre-1996 drug activity, we note that it is clear from the record that the trial judge's ruling on the motion in limine was conditional and tentative. In fact, the judge essentially invited counsel to raise the issue again at trial once the factual context of the evidentiary challenges became more apparent: "Well, if anything changes as far as a predicate concern on any of these matters, we will just take up a sidebar and I will rule. It is always easier to rule after I know a little bit more about a situation and the context." (emphasis added). Thus, it should have been obvious to the defendant's counsel that it was incumbent upon him to renew his objection at trial, or otherwise forfeit the argument on appeal. See Wilson v. Williams, 182 F.3d 562, 566-67 (7th Cir. 1999) (en banc) (stating that when a trial judge makes a conditional or tentative ruling on a pre-trial objection, the party must renew the objection during trial to preserve the litigant's position for appeal). Because he failed to renew his motion in limine at trial after the judge had made clear that his pre-trial ruling was tentative, his challenge to this evidence is waived and thus, plain error

review must apply. See id. at 568.

/9 Hughes never raised a Rule 403 objection at trial, but in spite of this fact, he contends that the trial judge failed to weigh the probative value of the pre-1996 drug activity against its potential for unfair prejudice under Federal Rule of Evidence 403. As the record clearly demonstrates, the defendant did not make a Rule 403 objection at trial, and without a timely objection, the judge was not on notice to engage in Rule 403 balancing. Thus, because Hughes' "counsel never objected under Rule 403 . . ., we cannot say that it was plain error for the court to allow the testimony." See United States v. Bursey, 85 F.3d 293, 297 (7th Cir. 1996).

/10 Further, we also do not agree with the defendant's argument that evidence of his uncharged drug activity constructively amended the indictment in light of the jury charge which adequately instructed the jury to consider the evidence to each charged offense:

The indictment charges that the offense was committed "on or about" certain dates. Although the evidence need not establish with certainty the exact date of the alleged offense, it must establish that the offense was committed on a date reasonably near the date charged.
. . .

Each count of the indictment charges the defendant with having committed a separate offense.

You must consider each count and the evidence relating to it separate and apart from every other count.

You should return a separate verdict as to each count. Your verdict of guilty or not guilty of an offense charged in one count should not control your decision as to the defendant under any other count.

Indeed, "the jury was instructed to consider each count and the relating evidence separately; there [is] no reason to suppose it would disregard this mandate." United States v. Coleman, 22 F.3d 126, 135 (7th Cir. 1994) (citation omitted); see also United States v. Stillo, 57 F.3d 553, 557 (7th Cir. 1995) (holding that a criminal defendant "must rebut the dual presumption that a jury will (1) capably sort through the evidence and (2) follow limiting instructions from the court") (quotation omitted).

/11 A multiple conspiracies instruction attempts to "preclud[e] the jury from using evidence relating to a conspiracy in which [the defendants] did not participate to convict them of the conspiracy charged in the indictment." United States v. Mims, 92 F.3d 461, 467-68 (7th Cir. 1996).

/12 Covering all possible arguments, Hughes also argues that his counsel was constitutionally ineffective by proposing a defective jury instruction. Although we prefer not to consider the merits of ineffective assistance of counsel claims raised on direct appeal, we will do so here because "the issue is sufficiently clear-cut"--although, against the defendant. See United States v. Limehouse, 950 F.2d 501, 503 (7th Cir. 1991). From our review of the record, we are convinced that the trial judge is not obligated to accept even a non-defective multiple conspiracies instruction. Indeed, "[i]t is not error to refuse a multiple conspiracies instruction where the evidence does not warrant such an instruction." See United States v. Lloyd, 25 F.3d 540, 547 (7th Cir. 1994); see also United States v. Johnson, 32 F.3d 265, 268 (7th Cir. 1994) ("There is little, if any, need for a multiple conspiracy instruction when the defendant[ ] [is] at the hub of the various possible agreements."). We conclude that Hughes has failed to establish that he was prejudiced by such ineffective assistance and we accordingly reject his ineffective assistance of counsel claim.

/13 At the sentencing hearing, the defendant did not raise a Rule 32 objection, but did argue to the judge that his counsel did not discuss the PSR with him.