UNITED STATES of America,
Plaintiff–Appellee,

v.

Mara Beth MONTAGUE,
Defendant–Appellant.

No. 93–1676.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 10, 1993.

Decided July 12, 1994.

318

Stephen B. Clark, Asst. U.S. Atty., Office of U.S. Atty., Criminal Div., Fairview Heights, IL (argued), for plaintiff-appellee.

George Edward Moorman (argued), Williamson, Webster, Groshong, Moorman & Falb, Donald Groshong, Alton, IL, for defendant-appellant.

Before MANION and KANNE, Circuit Judges, and WILL, District Judge.*

WILL, District Judge.

The defendant, Mara Beth Montague ("Montague"), was named in a 29-count indictment. She was convicted, on Count 1, of conspiring with several other defendants to violate 18 U.S.C. § 1956(a)(1)(A)(i), which prohibits what is commonly known as money laundering in connection with criminal activity. The indictment involved charged her with and she was convicted on 28 other counts (2–29) of money laundering a total of $10,320.00 in connection with separate prostitution transactions. She was sentenced to 60 months on the conspiracy count and 120 months on the 28 individual transaction counts, all to run concurrently.

Montague appeals, claiming (1) the evidence was insufficient to establish that she knew the money involved represented the proceeds of prostitution, a crime under Missouri law and (2) the sentencing judge erred in making findings and rulings in applying the Sentencing Guidelines.

We affirm, notwithstanding the fact that the sentences imposed are essentially for conduct in violation of state prostitution law, and are severe in comparison with those customarily imposed by state courts for similar conduct. This is a classic example of the federalization of a traditional state crime, prostitution, in order to obtain enhanced sentences by converting the state crime into money laundering, a federal offense. It demonstrates how an aggressive United States Attorney can use the money laundering statute as a means to take over from state prosecutors the prosecution of long-established state crimes and, in the process, secure more draconian sentences and increase the population of the already overcrowded federal prisons.

I.

## BACKGROUND

Montague operated several escort service businesses—Aaron's, A-1 Escorts, A Gentlemen's Preference, and A Absolute Angel—for customers in the St. Louis, Missouri metropolitan area. The proceeds from these escort businesses were deposited into an account at the First National Bank of Collinsville, located in Collinsville, Illinois, and an account at the Anna State Bank, located in Anna, Illinois. Many of the deposits consisted of credit card receipts under the merchant name "Ahead of the West," which Montague used to guarantee discretion for her customers on their monthly credit card statements.

---

* The Honorable Hubert L. Will, District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

In order for the Ahead of the West bank account to obtain funds from the credit card receipts, the banks forwarded the receipts to Credit Systems, Inc. in St. Louis, which then obtained funds by wire from the cardholders' banks. When the Ahead of the West account was opened, the banks were told that it was a horse-supply business.

For some time, Montague was assisted in the escort operation by her father—Francis Montague, her boyfriend—John Strother, and numerous others. In early 1988, Montague and Strother broke up; Strother then established his own escort services—Penthouse, Famous French Quarter Escorts, Absolute Angel, and A Gentlemen's Preference. Notwithstanding their separation (both personal and business), Strother and Montague continued to perform business services for each other such as staffing telephones and depositing proceeds until early 1990.

Both Montague's and Strother's escort operations advertised in the yellow pages of the local telephone directory. When potential customers called any of the services, the telephone operators would obtain the customer's name and location, ask what type of woman was preferred, and dispatch one of several female escorts employed by Montague or Strother to the customer's location. The fees for the escort service were $125.00 (cash payment) and $150.00 (credit card payment). Apparently, in many instances the escorts would perform acts of sexual intercourse, oral sex, or manual sex in return for the payment.[1] The escorts would then deliver the cash or credit card receipts to Montague, Francis Montague, Strother, or others designated by them, who deposited the proceeds in the banks.

By her own admission at trial, Montague had previously been convicted of prostitution in St. Louis County, Missouri. She also occasionally made escort calls herself, even while pregnant, when other women were unavailable.

Three prostitutes—Janet Hake, Tina Brown, and Donna Holloway—testified at trial that they had been employed by Montague for her escort services. Hake testified that the entries in her diary recorded the dates of visits that she made to customers for prostitution services and that the diary also contained the names and addresses of the customers on whom she called. She further testified that Montague would also go out on calls personally to provide sexual services to customers. Both Brown and Holloway testified that they had been in the prostitution business before being hired by Montague and that Montague recognized and appreciated the value of their past prostitution experience. For example, Brown, who was twenty-four years old at the time of trial, testified that she had been a prostitute for eleven years.

Each prostitute testified that escort businesses generally (and Montague's in particular) are engaged in prostitution. The prostitutes testified that they checked customers' identifications upon arrival to determine whether they were law enforcement officers. The prostitutes further testified that they received $62.50 per call, plus tips. Holloway testified that the prostitutes delivered credit card receipts and cash to Montague or her designates. Hake testified that she occasionally sent credit card receipts from St. Louis to Montague by Federal Express.

Brian Moreland testified that he answered the phones in Dongola, Illinois, for the escort businesses and that he dispatched escorts to the customers' locations. He occasionally travelled to St. Louis to pick up credit card receipts from the escorts, which he then delivered to Montague. Strother testified that he and Montague ran escort businesses together until 1988, and that they worked together until approximately February 1990.

Montague testified that she ran several escort businesses during the times alleged in the indictment. She further testified that she knew that some of the proceeds were from prostitution, although she claimed that it was solely up to the escorts whether or not to have sex. She testified that she received the same amount of money per call regard-

---

1. In her brief, the appellant concedes that the proof at trial "went on to show that while prostitution was never expressly discussed as a part of the escort service, many of the female escorts engaged in prostitution with clients." Br. of Appellant at 5.

less of whether or not the escort engaged in prostitution. She claimed at trial that she ran a horse-related business, although there is no evidence of this (except that she happened to own several horses). On her 1988 income tax returns, she indicated that her sole income was derived from a "Riding Academy;" however, she admitted at trial that she received income from her escort businesses in 1988, 1989, and 1990 (although her income is not identified as such on her tax returns for those years).

IRS Agent Robert Jenkins testified that Montague's check register showed numerous payments to telephone and other utility companies, as well as payments to Moreland, Francis Montague, and to cash. Numerous checks introduced into evidence represented large payments to Southwestern Bell, AT & T, and GTE, for telephone services for the escort businesses. A summary of credit card receipts, a summary of documented credit card transactions, and a summary of bank deposits were also introduced into evidence to track the flow of credit card receipts used by male customers for escort services.

Thirteen of Montague's customers testified that copies of their credit card slips under the merchant name "Ahead of the West," which were entered into evidence represented payments for sexual services from an escort service. These customers each indicated that it was common knowledge that escort services in the St. Louis area are, in reality, prostitution services. Each also testified that he knew, before calling the escort service, that he could expect sex for money when he called and that he was calling the service for the specific purpose of obtaining sex in return for payment.

Although the time period referenced in the indictment is from December 1988 through February 1990, Hake testified that the defendant operated the escort businesses after February 1990. Hake testified that Montague continued to run the business in 1991 and in 1992 from the hospital where she had just given birth to her child. Count 1 charged Montague and several others with conspiracy to commit money laundering. Counts 2–29 of the indictment charged Montague with laundering various amounts of prostitution proceeds totalling $10,320.00, each count reflecting a deposit at the bank of one or more credit card slips signed by customers who received sex in return for the charges. On September 28, 1992, a jury found Montague guilty on all counts.[2]

Although Counts 2–29 total only $10,-320.00, the total amount deposited during the relevant time period was $64,870.26. Strother testified that Montague has not been in any business other than prostitution since 1988. Therefore, the total amount of money deposited from December 1988 through February 1990—$64,870.26—was assumed to be from illegal activities and was used to calculate a base offense level of 23. A two-level increase was made for obstruction of justice. An additional four levels were added for the defendant's role as organizer or leader, resulting in a base offense level of 29. Her criminal history category was III. The guideline range was 108 to 135 months. Montague was then sentenced to 60 months on Count I and 120 months on Counts 2–29, all to run concurrently.

## II.

### DISCUSSION

#### A. Sufficiency of the Evidence

On appeal, Montague challenges the sufficiency of the evidence regarding her convictions for one count of conspiracy and twenty-eight counts of money laundering. In reviewing this claim, it should be noted that her burden

is formidable as we must affirm so long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Penson*, 896 F.2d 1087, 1093 (7th Cir.1990). In making this determination, we look to all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the government. We must affirm unless the record is barren of

---

**2.** Montague was the only defendant who actually went to trial. Her father, Francis Montague, pled guilty. Her ex-boyfriend, John Strother, entered into a plea agreement with the government.

any evidence, regardless of its weight, from which the trier of fact could find guilt beyond a reasonable doubt.

*United States v. Atterson*, 926 F.2d 649, 654–55 (7th Cir.), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2909, 115 L.Ed.2d 1072 (1991).

The money laundering statute under which Montague was convicted states in relevant part that:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> (A)(i) with the intent to promote the carrying on of specified unlawful activity ... shall be sentenced to ... imprisonment for not more than twenty years.

18 U.S.C. § 1956(a)(1)(A)(i).

The defendant's central argument on appeal is that she did not know that the proceeds from her escort service were proceeds from activities constituting the felony of promotion of prostitution in violation of Missouri state law.[3] She argues that she merely facilitated the meeting of two individuals—an act which in itself is not unlawful. Accordingly, she claims that she did not know of the illegal nature of the transactions or the proceeds. However, her own testimony at trial is inconsistent with such a contention; Montague stated, "I told them I didn't want to hear about it [prostitution]. It did go on. It did happen, but it was very strongly discour-

aged. I would still get my money." Tr. at 526.

Strother, her partner for some time, also testified that the escort services were fronts for prostitution and that Montague was not involved in any business other than escorts since 1988. He further testified that when he and Montague hired escorts, they told the new recruits that "they had to have sex." Tr. at 401. He stated that he and Montague told the escorts to make sure that the customers weren't police officers and to let them make the first move. The thirteen male customers also testified that they called Montague's escort service to obtain sex for money and that they in fact received sex for money. All of this testimony contradicts Montague's contention that she was unaware that her escort service promoted prostitution, within the meaning of the relevant Missouri law.

■ Under the money laundering statute, after establishing that the defendant knew that the property involved in a financial transaction represented proceeds from some form of unlawful activity, the government must then establish that the financial transaction in fact involved the proceeds of specified unlawful activity, which includes "any act or activity constituting an offense listed in section 1961(1) of [Title 18]." Section 1961(1)(B) includes "any act which is indictable under [18 U.S.C. § 1952]," which in turn states:

> (a) Whoever travels in interstate commerce or uses the mail or any facility in interstate ... commerce, with intent to—

---

**3.** The relevant sections of the Missouri Revised Statutes state the following:

**567.070. Promoting prostitution in the third degree.**

1. A person commits the crime of promoting prostitution in the third degree if he knowingly promotes prostitution.

2. Promoting prostitution in the third degree is a class D felony.

**567.010. Chapter definitions.**

⋅ ⋅ ⋅ ⋅ ⋅

(1) "Promoting prostitution", a person promotes prostitution if, acting other than as a prostitute or a patron of a prostitute, he knowingly

(a) Causes or aids a person to commit or engage in prostitution; or

(b) Procures or solicits patrons for prostitution; or

(c) Provides persons or premises for prostitution purposes; or

(d) Operates or assists in the operation of a house of prostitution or a prostitution enterprise; or

(e) Accepts or receives or agrees to accept or receive something of value pursuant to an agreement or understanding with any person whereby he participates or is to participate in proceeds of prostitution activity; or

(f) Engages in any conduct designed to institute, aid or facilitate an act or enterprise of prostitution;

(2) "Prostitution", a person commits prostitution if he engages or offers or agrees to engage in sexual conduct with another person in return for something of value to be received by the person or by a third person....

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3) shall be ... imprisoned for not more than five years....

18 U.S.C. § 1952. Under this statute, unlawful activity means "any business enterprise involving ... prostitution offenses in violation of the laws of the State in which they are committed." 18 U.S.C. § 1952(b).

■ On appeal, Montague does not challenge the applicability of section 1952 to this case. Rather, she argues that she did not know for certain that prostitution was occurring, or the specific occasions on which the acts of prostitution took place, and, therefore, did not know that the proceeds she received were from unlawful activity. The government correctly suggests that Montague's sufficiency of evidence argument is similar to the one raised by the defendants in *United States v. Campione*, 942 F.2d 429 (7th Cir. 1991).

In *Campione*, the defendants were convicted of conspiracy to violate RICO and thirty-two violations of the Travel Act. Their convictions arose from the use of interstate telephone transmissions to obtain authorization for credit cards used to pay for prostitution services at a nude dancing establishment. The Travel Act violations provided the underlying predicate acts for the RICO violation. On appeal, the defendants argued that there was insufficient evidence for the jury to have concluded that acts in violation of Illinois state prostitution laws occurred in connection with the Travel Act violations alleged in the indictment.

In rejecting this argument, we stated:
But § 1952 refers to state law only to identify the defendant's unlawful activity, the federal crime to be proved in § 1952 is the use of interstate facilities in furtherance of the unlawful activity, not the violation of state law; therefore, § 1952 does not require that the state crime ever be completed.... Since § 1952 does not incorporate state law as part of the federal

offense, violation of the Act does not require proof of a violation of state law.... Furthermore, the Travel Act targets those with intent to promote or carry on or facilitate the promotion or carrying on of any unlawful activity; it is not limited to those who engaged in the unlawful activity. Unlawful activity in the context of this case means prostitution offenses in violation of the laws of the state in which they are committed. The jury did not need to determine whether acts of prostitution occurred after the approval of each of the credit card transactions listed in the indictment to reasonably conclude that the facilitation of the carrying on of prostitution offenses had occurred. It was sufficient for the government to present evidence from which a reasonable juror could find that each credit card charge entitled the patron to spend time with a dancer and provided him with the opportunity to engage in oral sex or sexual intercourse. To have provided patrons with this opportunity could reasonably be found by a jury to have facilitated the promotion of the unlawful activity referred to in the indictment, that is the prostitution offenses that commonly occur when maintaining a house of prostitution.

942 F.2d at 434 (citations omitted).

Similarly, in this case, the Missouri prostitution statute forms the basis for a violation of § 1952, which is a type of racketeering activity listed in § 1961, and is a specified unlawful activity designated in the money laundering statute—§ 1956.

Accordingly, the defendant's conviction must be affirmed.

### B. *Montague's Sentence*

On appeal, Montague also challenges several aspects of her sentence. In sentencing Montague, the district court imposed a two-point increase for obstruction of justice. U.S.S.G. § 3C1.1 states:
If the defendant wilfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

The commentary to this section provides a non-exhaustive list of examples of the type of conduct to which this enhancement applies and includes "escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding." U.S.S.G. § 3C1.1, Application Note 3(e). The increase in Montague's sentence was based on her failure to appear for a hearing before Magistrate Frazier on July 29, 1992.

On appeal, Montague argues that this increase was improper because she was injured[4] at the time and unable to drive, had spoken to the arresting officer, Jenkins, a week prior to the hearing, and was told by him that she need not appear at the hearing. Although Montague claims that Jenkins told her she did not have to appear, Jenkins refuted this, testifying that when Montague called him, he told her that he was unaware of the scheduled hearing but would look into it and get back to her. He also testified that he later left a message for her at her boyfriend's home, where she was living at the time. The sentencing judge found that Montague's veracity was suspect, that her failure to appear caused the government the inconvenience of having the Marshal's Service arrest her, and also obstructed the proceedings, delayed the magistrate, and delayed the processing of the case. He further found that her failure to appear was willful and thus assessed the increase.

■ "A sentencing court's determination that a defendant obstructed justice is a finding of fact which is reviewed on appeal under a clearly erroneous standard." *United States v. Kaufmann*, 985 F.2d 884, 899 (7th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 2350, 124 L.Ed.2d 259 (1993). Accordingly, this Court should defer to the district court's determination unless left with the firm and definite conviction that a mistake has been committed. While we may question somewhat the district court's determination to assess the increase under all the circumstances, we are hesitant to find that the district court erred, especially in light of the deferential standard of review. By her own admission, Montague received notice of the hearing but nonetheless failed to appear although there is disagreement as to whether or not she reasonably believed her appearance was excused.

■ Montague next argues that she was entitled to a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. She claims that she accepted responsibility for an escort service, but not for the acts of prostitution which others committed. In her arguments on appeal, she continues to deny that she knew that the proceeds which she deposited were the fruits of prostitution. Accordingly, the court's determination that she "has not accepted responsibility for being involved in the crime of money laundering which necessarily implicates taking proceeds from an illegal activity which in this case is prostitution" was proper.

Montague also argues that the district court erred in giving her a four-point adjustment for having five or more participants in the criminal activity pursuant to U.S.S.G. § 3B1.1(a). In her brief on appeal, Montague acknowledges that "there were more than five participants in the underlying escort service if one counts all of the escorts." Br. of Appellant at 12. She claims, however, that there were fewer than five participants in the management aspects of the activity and that this fact should preclude the adjustment under § 3B1.1(a).

■ Under U.S.S.G. § 3B1.1(a), the sentencing court need not confine itself to the offense of conviction but may look to all relevant conduct within the scope of U.S.S.G. § 1B1.3 (Relevant Conduct). Amendment 345 added the following language to the Introductory Commentary of this section of the guidelines:

> The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), *i.e.*, all conduct included under § 1B1.3(a)(1)–(4), and not solely on the basis of the elements and acts cited in the count of conviction.

> This amendment clarifies the conduct that is relevant to the determination of

---

4. Apparently, Montague's leg was in a cast.

Chapter Three, Part B, and clarifies the operation of § 3B1.2 in certain cases. The effective date of this amendment is November 1, 1990.

U.S.S.G. Appendix C at C.189, Amendment 345 (Nov. 1, 1990). As the Second Circuit has observed, "the effect of this commentary change is to foreclose after November 1, 1990, any interpretation of the word 'offense' that restricts it to the offense of conviction." *United States v. Perdomo*, 927 F.2d 111, 116 (2d Cir.1991). Accordingly, the district court did not err in making this adjustment.[5]

### III.

### CONCLUSION

For the reasons articulated above, the defendant's conviction and sentences are affirmed.

AFFIRMED.

---

5. Although this amendment was not in effect at the time of the commission of the offense, it may properly be applied retroactively in this case. Amendment 345 is a clarifying amendment, as is clear from the language in Appendix C. *See Perdomo*, 927 F.2d at 117; *United States v. Caballero*, 936 F.2d 1292, 1298–99 (D.C.Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 943, 117 L.Ed.2d 113 (1992); *United States v. Rodriguez*, 925 F.2d 107, 111 (5th Cir.1991); *United States v. Fells*, 920 F.2d 1179, 1185 (4th Cir.1990), *cert. denied*, 501 U.S. 1219, 111 S.Ct. 2831, 115 L.Ed.2d 1000 (1991); *United States v. Bierley*, 922 F.2d 1061, 1065 (3d Cir.1990). It is clear in this Circuit that amendments intending only to clarify and not to make substantive changes may be considered in interpreting a guideline provision even though the amendment was not effective at the time of the commission of the offense. *United States v. Fiala*, 929 F.2d 285, 290 (7th Cir.1991).

Moreover, there is evidence in the record to support the claim that, even without the other prostitutes, the following individuals were involved directly in the money laundering aspects of the case: (1) Strother; (2) Montague; (3) Francis Montague; (4) Moreland; and (5) Hake. Thus, even if Amendment 345 could not be retroactively applied in this case, the district court's adjustment pursuant to § 3B1.1(a) was proper.