In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3840

United States of America,

Plaintiff-Appellee,

v.

Everette O. Baker, d/b/a Bettye's Touch Above,
d/b/a Fantasyland Theater & Arcade, d/b/a/ Fantasyland
Night Club, d/b/a Fantasyland
Massage Parlor, d/b/a Fantasy Massages,
d/b/a Fantasy Massage Parlor, d/b/a American
Printing & Publishing Company,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 97 CR 30079--William D. Stiehl, Judge.

Argued May 19, 2000--Decided September 20, 2000

Before Flaum, Chief Judge, and Manion and Williams,
Circuit Judges.

Manion, Circuit Judge.  Everette Baker operated
massage parlors that were fronts for his
prostitution business. In addition to cash, his
operation used credit card and automatic teller
machine (ATM) transactions. He used the proceeds
from his prostitution business to maintain and
expand that business, as well as several other
legal "adult businesses." He was convicted of
money laundering and conspiracy to commit money
laundering and in addition to being sentenced to
fifteen years in prison, was ordered to forfeit
millions of dollars. We affirm Baker's
convictions, sentence, and the forfeiture order.

I.  Background

From 1989 to 1997, Baker operated a complex of
interrelated sex businesses in Brooklyn,
Illinois, including striptease bars, adult
bookstores and movie theaters, and x-rated video
arcades. The cornerstone of Baker's "Fantasyland"
complex, however, was the "massage parlors" that
were fronts for prostitution. The businesses were
related in that customers who indulged in the

legal adult businesses would fulfill their fantasy in another building in the compound where the prostitutes disguised as masseuses held forth. Customers would select a "masseuse" from a line-up and then rent a room by paying a "house charge" up front. After the customer and the "masseuse" went into a room, the customer would select the type of "massage" he wanted. The prostitutes never discussed specifics with the customers; they simply told the customers that the more they were willing to pay, the more "sensual" the massage would be. Customers would pay the prostitutes with "tips." Both the room rentals and "tips" were often paid by credit card or ATM transactions.

Over the years, Baker employed hundreds of prostitutes, so likely everyone in Brooklyn who cared knew what was going on. Indeed, two daughters of the chief of police, and at one time the brother and the cousin of the mayor, were on Baker's payroll. Around the holidays, Baker provided a sort of "Christmas bonus"--free "massages" to various municipal employees as a show of gratitude for allowing him to operate in Brooklyn without much (if any) interference. And Baker had good reason to be appreciative. His "adult businesses" (both legal and illegal) were extremely lucrative. Baker had gross revenues during this time of about nine million dollars. It was obviously a fairly extensive operation, with various managers helping Baker with the business (e.g., collecting money, reconciling accounts, stocking on-site ATMs).

To disguise his activities, he set up dummy checking accounts and credit card clearinghouse accounts at area banks under the name of American Printing and Publishing Company. He deposited the proceeds from his prostitution and other ventures into these accounts and wrote checks on the accounts to pay his operating expenses, such as utilities and payroll. Baker not only plowed the proceeds from his sex empire back into his businesses to maintain their operation, he reinvested the proceeds by building additional "massage parlors" and other adult businesses in the Fantasyland complex. Between January 1990 and December 1996, the massage parlors accepted credit cards for prostitution services. "In May of 1995, the defendant, keeping up with modern times and for the convenience of his customers, installed an ATM machine in the Fantasyland massage parlor and adjacent topless nightclub." See United States v. Baker, 82 F. Supp.2d 936, 939 (S.D. Ill. 1999). In 1996 Baker stopped accepting credit card payments after he learned that other people "in the business" had faced federal prosecution for money laundering.

While local officials apparently weren't inclined to interfere with Baker's illegal enterprise, the federal prosecutors had seen enough. In January 1997, his operation was raided. Baker reacted by transferring ownership of his businesses to his son, but he continued to maintain de facto control over the operation. Although prostitution is not a federal offense, money laundering is if the laundering is carried out using the means of interstate commerce. Baker allowed customers to pay for "massages" with credit card and ATM transactions which went across state lines to clearinghouses (the proceeds of which were deposited into dummy accounts). Baker thus used interstate wires to further and facilitate his prostitution business. In late 1997, the United States indicted Baker on fifteen counts of money laundering under 18 U.S.C. sec. 1956(a)(1)(A)(i), six counts of engaging in monetary transactions in criminally-derived property under 18 U.S.C. sec. 1957, and one count of conspiracy to launder money under 18 U.S.C. sec. 1956(a)(1)(A)(i) & (h). It also requested a forfeiture of millions of dollars under 18 U.S.C. sec. 982. See Baker, 82 F. Supp.2d at 937.

A jury convicted Baker of all counts except for the forfeiture count (which Baker agreed to have the court resolve on the briefs). The court sentenced Baker to 120 months on the money laundering charges and 180 months on the conspiracy charge (to run concurrently). In determining Baker's sentence, the district court increased his offense level by seven by including as relevant conduct millions of dollars of income from his "massage parlor" business as funds that were involved in his conspiracy to launder money (it did not include money from Baker's legal sex businesses, although it concluded that this money too was involved in Baker's money laundering conspiracy). The district court also increased Baker's offense level by five for leading a criminal enterprise of five or more persons. And it increased his offense level by two for obstruction of justice, which was based on transferring ownership of the businesses to his son.

As to forfeiture, the government sought to recover the "Fantasyland" complex and $7.5 million as proceeds from Baker's conspiracy to launder the monies from his prostitution business. Baker countered that only $2,590 should be subject to forfeiture as the amount of the specific credit card transactions that the indictment had set forth. The district court ordered Baker to forfeit all the monies that had been involved in the federal activities, not just the credit card transactions the government had

proved. See Baker, 82 F. Supp.2d at 941-42. The court found that Baker's bank accounts were used to facilitate his federal crimes and therefore the millions of dollars that had passed into and out of these accounts were subject to forfeiture. Id. at 942-43. After deleting some entries to avoid double-counting, it ordered Baker to forfeit about $4.4 million as well as the real estate where the "Fantasyland" compound was located. See id. at 944.

## II. Discussion

Baker appeals his conviction, arguing that the indictment was constructively amended by the district court's jury instructions and the government's comments during closing argument. He also appeals his sentence enhancements, arguing that it was improper for the court to include millions of dollars from his prostitution business, to find that he led five or more people in a criminal enterprise, and to find that he obstructed justice. Finally, he appeals the forfeiture order.

## A. The Indictment

Baker contends that his conviction must be overturned because the indictment in this case was constructively amended in violation of the Fifth Amendment. The Fifth Amendment to the Constitution provides in relevant part that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. Amend. V. A constructive amendment of an indictment violates the Fifth Amendment, United States v. Willoughby, 27 F.3d 263, 266 (7th Cir. 1994), and "occurs when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented to the grand jury." United States v. Cusimano, 148 F.3d 824, 829 (7th Cir. 1998). Thus, a "constructive amendment occurs where the offense proven at trial was not included within the parameters of the indictment." United States v. Remsza, 77 F.3d 1039, 1043 (1996). But not every variation from the verbiage of the indictment, either in terms of proof or jury instructions, constitutes a constructive amendment. See Willoughby, 27 F.3d at 266 (It "is important to note that not all variations in proof that contradict or supplement verbiage in the indictment rise to the level of constructive amendments."); United States v. Pigee, 197 F.3d 879, 886 (7th Cir. 1999) ("We believe that the variances in the court's instruction on Count 6 were so minor that they would not generate any

risk that Lipscomb would be convicted of a crime not charged."). The proof at trial or jury instructions must go "beyond the parameters of the indictment in that it establishes offenses different from or in addition to those charged by the grand jury." Pigee, 197 F.3d at 886.

In this case, one of the bases for Baker's convictions, the federal money laundering statute, provides that

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--

(A)(i) with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced to a fine . . . or imprisonment for not more than twenty years or both.

18 U.S.C. sec. 1956(a)(1)(A)(i) (emphasis added). "Specified unlawful activity" is defined in sec. 1956(c)(7) as "any act or activity constituting an offense listed in [18 U.S.C. sec.] 1961(1)" (which defines the predicate acts for a RICO violation). Section 1961(1)(B), in turn, lists 18 U.S.C. sec. 1952 (the "Travel Act") as an offense. And the Travel Act provides that:

(a) Whoever travels in interstate commerce or uses the mail or any facility in interstate . . . commerce, with intent to--

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform--

(A) any act described in paragraph (1) or (3) shall be fined under this title, imprisoned for not more than five years, or both; . . . .

18 U.S.C. sec. 1952(a). The Travel Act defines as an "unlawful activity" any crime of prostitution under state law. Id. at sec. 1952(b). Thus, a person launders money if he makes deposits and withdrawals at banks (conducts "financial transactions"), knowing that they contain proceeds from prostitution ("some form of unlawful activity"), in order to promote using credit cards in a prostitution business (a "specified unlawful activity") if the proceeds from prostitution in fact involve monies from credit card transactions in a prostitution business ("specified unlawful activities"). See

18 U.S.C. sec. 1956(a)(1)(A)(i); United States v. Griffith, 85 F.3d 284, 287 (7th Cir. 1996); United States v. Montague, 29 F.3d 317, 321-22 (7th Cir. 1994).

To establish a Travel Act violation it is not necessary for the government to prove that an act of prostitution under Illinois law followed each credit card transaction. See United States v. Campione, 942 F.2d 429, 434 (7th Cir. 1991). Section "1952 refers to state law only to identify the defendant's unlawful activity[;] the federal crime to be proved in sec. 1952 is use of the interstate facilities in furtherance of the unlawful activity, not the violation of the law; therefore sec. 1952 does not require that the state crime ever be completed." Id. In short, "[s]ince sec. 1952 does not incorporate state law as part of the federal offense, violation of the Act does not require proof of a violation of state law." Id.

Baker acknowledges that, in theory, the government need not prove an underlying act of prostitution to make out a violation of the Travel Act. He argues, however, that the government was required to do so here because the indictment charged him with violating the Travel Act by causing his employees to use credit cards in order to "provide prostitution services," with the implication being that an act of prostitution must result from each credit card transaction. As a result, he argues that the indictment was constructively amended when the district court instructed the jury that it was sufficient if the government proved that a credit card transaction entitled a customer to spend time with a masseuse, thereby affording him the opportunity to engage in sex, and that the government need not prove that each credit card transaction actually resulted in an act of prostitution. Similarly, he complains about the government arguing to the jury that it need only prove that "the use of the interstate facilities was in furtherance of the illegal activity," and that while the government did prove transactions "in which customers actually did receive sex for the use of credit cards," it was not required to do so. In short, according to Baker, because the jury instructions relieved the government of the responsibility of proving that an act of prostitution resulted from each credit card transaction, the instructions and the government's statements during closing argument constructively amended the indictment by allowing him to be convicted of an offense that is broader than or different from that set out in the indictment.

It is true that if an indictment makes a fact or

a manner of committing an offense material to that offense, that fact or manner must be proven, not a substantially different one. See United States v. Johnson, 152 F.3d 618, 630 (7th Cir. 1998) (where indictment specifically described destructive devices, government was required to provide proof substantially consistent with that description); United States v. Leichtnam, 948 F.2d 370, 374-75, 379-81 (7th Cir. 1991). But Baker misreads the indictment. The government did not make committing an act of prostitution material to the Travel Act violation (and hence the money laundering and conspiracy crimes). As a result, the jury instructions--which were taken from Campione, see 942 F.2d at 434--did not constructively amend the indictment (nor did the government's statements in accordance with them).

   The indictment in this case listed the Travel Act as the predicate offense for the "specified unlawful activity" component for the money laundering counts, and it set forth the Illinois statute criminalizing the keeping of a house of prostitution as the predicate offense for the Travel Act. For all counts, the indictment also stated that the instrument of interstate commerce that Baker used to promote the unlawful activity of prostitution (as required by the Travel Act) was the processing of credit card charges for "prostitution services." Examples of relevant paragraphs of the indictment are as follows:

20. Each [financial transaction affecting interstate commerce] in fact involved the proceeds of unlawful activity specified in Title 18, United States Code, Section 1956(c)(7)--that is, activity constituting an offense listed in Title 18, United States Code, Section 1961(1), namely:

activity in which defendant EVERETTE O. BAKER caused use of facilities in interstate commerce with intent to carry on the unlawful activity of a business enterprise involved in Conspiracy to Keep a Place of Prostitution, in violation of Chapter 720, Act 5, Illinois Compiled Statutes (formerly Chapter 38, Illinois Revised Statutes), Sections 11-17 and 8-2, and in which defendant EVERETTE O. BAKER thereafter caused to be performed acts to carry on said unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

21. It was part of the manner and means of accomplishing this specified unlawful activity that defendant EVERETTE O. BAKER caused his employees to use the wires in interstate commerce to obtain credit approval from a credit card clearing house in St. Louis, Missouri, for each customer who presented his credit card to obtain

prostitution services at said defendant's place of business within the Southern District of Illinois. After such approval was obtained, said defendant's employees engaged in prostitution services with such customers.

The provisions of Illinois law to which paragraph 20 of the indictment refers is not the offense of engaging in prostitution but of "Keeping a Place of Prostitution" and "Conspiracy" or, as the indictment states, a "Conspiracy to Keep a Place of Prostitution." See 720 ILCS 5/8-2 ("Conspiracy") and 720 ILCS 5/11-17 ("Keeping a Place of Prostitution"). Thus, under paragraph 20, Baker only need use interstate facilities with the "intent to carry on" his conspiracy to keep a place of prostitution. See Campione, 942 F.2d at 434 ("But the indictments in this case are not limited, as defendants would have us believe, to oral sex or sexual intercourse. . . . Those paragraphs of the Illinois Revised Statutes [in the indictment] refer respectively to Conspiracy [sec. 8-2], Prostitution, Soliciting for a Prostitute, Pandering, Keeping a Place of Prostitution [sec. 11-17], and Pimping.").

With respect to paragraph 21, it first states that as part of Baker's conspiracy to keep a place of prostitution he "caused his employees to use the wires in interstate commerce to obtain credit card approval . . . for each customer who presented his credit card to obtain prostitution services at said defendant's place of business . . . ." This is the Travel Act violation. See id. at 435 (using "the interstate telephone system to secure authorization for the credit card transactions set out in the indictment facilitated the carrying on of keeping a place of prostitution, one of the state offenses listed" in the indictment). And this violation is not tied to the actual commission of an act of prostitution. It is clearly predicated on a customer presenting his credit card to obtain prostitution services, not on the customer having actually obtained such services.

The next sentence is a closer question. This part of paragraph 21 states that "[a]fter such approval was obtained, [Baker's] employees engaged in prostitution services with such customers." We think that this sentence merely identifies the underlying state offense, as the Travel Act requires. See Campione, 942 F.2d at 434. Unlike in Leichtnam, supra, this part of the indictment does not make the actual completion or commission of prostitution services material to the offense; there is no "to wit" or similar language. See also Willoughby, 27 F.3d at 266 ("'To wit' is an expression of limitation which, as our cases indicate, makes what follows an

essential part of the charged offense."). At any rate, Baker concedes that he did not claim below that the indictment was constructively amended, so we review this forfeited issue for plain error. See Fed. R. Crim. P. 52(b); United States v. Hughes, 213 F.3d 323, 328 (7th Cir. 2000).

Under this standard, there must be: 1) an error; 2) that is clear or obvious; and 3) that affects substantial rights. United States v. Olano, 507 U.S. 725, 732-35 (1993); Cusimano, 148 F.3d at 828. "In an effort to clarify when an error affects substantial rights, the [Supreme] Court said 'in most cases it means that the error must have been prejudicial: It must have affected the outcome of the District Court proceedings.'" Remsza, 77 F.3d at 1044 (quoting Olano, 507 U.S. at 734). In this circuit it is clear that "the constructive amendment 'must constitute a mistake so serious that but for it the defendant probably would have been acquitted in order for us to reverse.'" Hughes, 213 F.3d at 329 (quoting Cusimano, 148 F.3d at 828); see also Remsza, 77 F.3d at 1044. Even then, "we have the power to correct the error but are not required to do so." Cusimano, 148 F.3d at 828 (citing Olano, 507 U.S. at 735). "We will not reverse unless we find the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id.; see also, Remsza, 77 F.3d at 1044. Here, it is not plain or obvious the "engaged in prostitution services" sentence means that an actual act of prostitution is part of the Travel Act violation in this case--particularly in the context of the preceding sentence and paragraph. Because it is not obvious that the indictment narrowed the charge as Baker contends, the jury instructions and statements in closing argument did not impermissibly broaden the indictment.

But even if it were plain that the indictment narrowed the predicate state offense for the Travel Act violation as Baker urges, we still would not reverse his conviction. Baker does not contend that the government did not prove that acts of prostitution followed the credit card transactions. As a result, we cannot say that "but for [the constructive amendment] the defendant probably would have been acquitted." Hughes, 213 F. 3d at 329. Contrast Willoughby, 27 F.3d at 267 ("since no evidence linked the gun to Willoughby's actual distribution of cocaine . . . the weapons conviction could only have been based upon a" theory not charged in the indictment). Moreover, given that Baker does not show that he was prejudiced in his defense, we also cannot say that this assumed error seriously affected "the fairness, integrity, or public reputation of judicial proceedings." Hughes, 213 F.3d at 329.

Finally, Baker argues that the indictment was

constructively amended when the district court allowed the government to argue another theory during closing argument: money laundering was spending or withdrawing funds from the illegal prostitution business, regardless of any connection to interstate commerce. The government points out that the statement Baker zeros in on was from its introductory remarks at closing argument when it was distinguishing the money laundering in this case from "concealment" money laundering (set out in 18 U.S.C. sec. 1956(a)(1)(B)(i)). Jury instructions are viewed as a whole. United States v. Thornton, 197 F.3d 241, 254 (7th Cir. 1999). We have reviewed the court's instructions, and they accurately state the law; indeed, as noted, most of the instructions Baker complains about are from our opinion in Campione. See also Montague, 29 F.3d at 322. On the whole, then, the government's remark distinguishing the money laundering in this case from "concealment" money laundering did not constructively amend the indictment. See Pigee, 197 F.3d at 886 ("We believe that the variances in the court's instruction on Count 6 were so minor that they would not generate any risk that Lipscomb would be convicted of a crime not charged.").

## B.  The Sentence Enhancements

In determining Baker's sentence, the district court's factual findings are reviewed for clear error and its interpretation of the Sentencing Guidelines is reviewed de novo. United States v. Emerson, 128 F.3d 557, 562 (7th Cir. 1997). A district court's "characterization of a defendant's role in an offense and its determination of the . . . money attributable to a defendant are factual determinations" that are reviewed only for clear error. United States v. House, 110 F.3d 1281, 1283 (7th Cir. 1997). "Under this standard, we will vacate appellants' sentences only if the district court's findings are without foundation in the evidence, such that we are left with the definite and firm conviction that a mistake has been committed." Id.

### 1.  Including the proceeds involved in the conspiracy.

The Sentencing Guidelines provide that 23 is the base offense level for someone convicted under 18 U.S.C. sec. 1956(h) of conspiracy to launder money in violation of 18 U.S.C. sec. 1956(a)(1)(A)(i). See U.S.S.G. sec. 2S1.1(a); House, 110 F.3d at 1287-88. If the "volume of funds" involved in the money laundering exceeds $100,000, then the base level is enhanced, depending upon the amount. See U.S.S.G. sec.

2S1.1(b)(2). And since the "value of funds" involved in a money laundering offense is a specific offense characteristic, we must look to a defendant's relevant conduct to determine that value. See United States v. Sokolow, 91 F.3d 396, 410 (3d Cir. 1996) (citing U.S.S.G. sec.sec. 1B1.3(1) and 2S1.2(b)). The Relevant Conduct section of the Sentencing Guidelines requires courts to consider:

(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

U.S.S.G. sec. 1B1.3(a)(1) (emphasis added). The Commentary to sec. 2S1.1 states that the "amount of money involved is included as a factor because it is an indicator of the magnitude of the criminal enterprise, and the extent to which the defendant aided the enterprise." (Emphasis added.)

The district court determined that about $4.4 million was involved in Baker's conspiracy to launder money from his prostitution business, so it increased his base level by seven. See id. at sec. 2S1.1(b)(2)(H). The court arrived at this figure by focusing on the amount of income Baker received from his "massage parlor" business from 1990 to 1997; it declined to include monies that Baker received from his related legal businesses, although it concluded that the money from these ventures was also involved in Baker's money laundering conspiracy. Baker argues that it was excessive to include the income from his prostitution business over eight years because: 1) the government charged in the indictment that the "specified unlawful activity" of his laundering of his prostitution proceeds was $2,590 in specific credit card transactions; and 2) the conspiracy only lasted for the six months he shared control with his son.

As to Baker's first contention, Baker was not just convicted of money laundering; he was also convicted of conspiring to launder money. For purposes of the conspiracy, the indictment charged fifteen specific instances of credit card

usage (the $2,590) to establish some of the overt acts of the conspiracy and to show that interstate wires were in fact used to obtain prostitution services (indeed, the primary purpose of the credit card and ATM system was to facilitate the prostitution business). These specific credit card transactions do not serve to limit the amount of money "involved" in Baker's conspiracy. Baker was in fact convicted of laundering amounts much larger than $2,590 (about $206,000), and he was convicted of conspiring over the years to launder a lot more than that.

Indeed, the amount of funds that are included as part of Baker's "relevant conduct" is not even limited by the funds charged in the money laundering counts themselves. See Sokolow, 91 F.3d at 411 ("Funds associated with uncharged instances of money laundering can be added in to determine the offense level under sec. 2S1.1 if those acts are within the scope of relevant conduct under sec. 1B1.3(a)(2). Thus, in determining the 'value of funds' under sec. 2S1.1, the district court is not necessarily limited only to the funds identified with the counts of conviction."). In a conspiracy spanning several years, the value of funds is determined by the amount of money that is "reasonably foreseeable" to Baker, including monies that were generated (and then laundered) to further or facilitate the conspiracy. See House, 110 F.3d at 1284-85 ("Because a sentencing court is required to take into account not only the acts of a defendant charged with conspiracy, but also 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,' these total amounts would be attributable to a defendant found to have reasonably foreseen the scope of the conspiracy.") (quoting U.S.S.G. sec. 1B1.3(a)(1)(B)). Here, the district court did not clearly err in concluding that the millions of dollars from Baker's "massage parlor" business, which over the years he conspired to launder by depositing into and withdrawing from dummy accounts, were reasonably foreseeable to him as furthering and facilitating his conspiracy. These funds "bankrolled" his prostitution business and thereby his money laundering conspiracy, including the conspiracy's receipt and use of credit card and ATM transactions. Cf. United States v. $448,342.85, 969 F.2d 474, 477 (7th Cir. 1992) ("Money need not be derived from a crime to be 'involved'; perhaps a particular sum is used as the bankroll facilitating the fraud."). As the head and "mastermind" of the operation, Baker was obviously privy to the funds that were generated and used in the conspiracy. See U.S.S.G. sec. 1B1.3(a)(B).

Furthermore, it is not necessary, as Baker contends, for the government to separate out income from bona fide massages (whatever those were) from income from sexual services. The "clean" money was also "involved in" the conspiracy in that, as noted, it helped further and facilitate the operation. Cf. $448,342.85, supra; United States v. Tencer, 107 F.3d 1120, 1134 (5th Cir. 1997) (because "clean" money that is commingled with "unclean" money facilitates the money laundering operation, the "clean" money is "involved" in the offense and is therefore forfeitable); United States v. Jackson, 935 F.2d 832, 840 (7th Cir. 1991) (Section 1956(a)(1)(A)(i) allows "for convictions where the funds involved in the transaction are derived only in part from 'specified unlawful activities.'" We "cannot believe that Congress intended that participants in unlawful activity could prevent their own convictions under the money laundering statute simply by commingling funds derived from both 'specified unlawful activities' and other activities. Indeed, the commingling in this case is itself suggestive of a design to hide the source of ill-gotten gains . . . ."). Nor is it necessary for the government to attempt to separate proceeds from ATM and credit card transactions in the prostitution business from other proceeds. The "other" proceeds from prostitution also helped further and facilitate the operation and thus were part of the money laundering conspiracy. To determine the value of funds, the government need not trace each dollar of income by the means of payment, and it need not trace each dollar to a specific instance of laundering. Cf. id. (To prove money laundering under 18 U.S.C. sec. 1956(a), "[w]e do not read Congress's use of the word 'involve' as imposing the requirement that the government trace the origin of all funds deposited in a bank account to determine exactly which funds were used for what transaction.").

As to Baker's second contention, the money laundering conspiracy was much longer than the six months that Baker's son had nominal control. It lasted for several years. Baker complains that the government stipulated that his son was a part of the conspiracy only for several months and that during this time the only proven amount of financial transactions was $235,000. But Baker was not part of the stipulation, and the stipulation did not purport to deal with all of Baker's activities. The government's stipulation as to the involvement of Baker's son in the conspiracy does not preclude it from showing that Baker conspired with others for much longer. And the district court did not clearly err in finding that from 1990 to 1997 Baker conspired with at least seven others-- upper-level and mid-level

managers, supervisors, and lower-level employees--to launder money from his prostitution business (the involvement of whom we shall discuss next).

  2. Leading five or more people in a criminal enterprise.

  Pursuant to sec. 3B1.1 of the Guidelines, the district court enhanced Baker's offense level by four for leading or organizing criminal activity involving five or more people. As noted, Baker argues that to the extent there was a conspiracy to launder money, it only involved him and his son; therefore, he contends that he should not have his sentence increased under sec. 3B1.1. But the "determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of sec. 1B1.3 (Relevant Conduct), i.e., all conduct included under sec. 1B1.3(a)(1)-(4), and not solely on the basis of elements and acts cited in the count of conviction." U.S.S.G., Chapter 3, Part B, Introductory Comment; see also Montague, 29 F.3d at 324 (The "effect of this commentary change is to foreclose . . . any interpretation of the word 'offense' that restricts it to the count of conviction."). As with determining the specific offense characteristics for Baker's conspiracy conviction, then, the district court was required to consider the Relevant Conduct provision in determining Baker's role in the offense. This meant it had to consider "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. sec. 1B1.3(a)(1)(B) (emphasis added).

  The evidence clearly shows that Baker led and organized at least seven employees. These people processed credit card transactions, kept the books, issued checks, accounted for shift receipts, delivered the receipts to Baker and his son, hired and fired masseuses, made schedules, held meetings, and set policies; all knew that Baker was laundering the proceeds of the prostitution business which ultimately furthered that business, including its receipt and usage of credit card and ATM transactions. The activities of these people were thus integral to the conspiracy. The district court did not clearly err in considering them in evaluating Baker's role in the offense. See House, 110 F.3d at 1284 (although wires in a money laundering conspiracy were sent and received by several people, the

defendant ultimately received the proceeds and was the common connection between the co-conspirators; therefore, he properly received a four-level enhancement as an organizer or leader).

    3.   Obstruction of justice.

   The district court also enhanced Baker's offense level by two for attempting to obstruct justice based on his transfer of the business to his son after it was raided. See U.S.S.G. sec. 3C1.1. Baker argues that his enhancement was improper because the government did not prove that he intended to obstruct justice, nor did it prove that this transfer, in fact, caused it to spend more resources to investigate or prosecute this matter. With respect to Baker's first argument, the district court found that Baker transferred the property to "divert" the authorities from his enterprise. While Baker argues that "divert" is not the same thing as "obstruct" or "impede," this parsing of the district court's finding is disingenuous: the district court found that Baker transferred this property to "divert" the authorities in the hope that it would cause them to stop their efforts. Specifically, it found that Baker "was going to put the business in his son's name, so it will all fall back on him." His intent was "to divert at least the investigative officers and agents and the prosecutors from pursuing this matter any further . . . ." Thus, the court found that he intended to obstruct justice, and this finding is not clearly erroneous.

   As to Baker's second argument, he notes that real estate cannot be hidden (unlike chattel), and that he transferred this property by way of a deed which was on the public record. Because the chain of title is clear, he argues, there is no mystery as to ownership of the business. But an attempt to conceal evidence that is material to an investigation, such as by transferring assets to another, warrants an enhancement for obstruction of justice. See U.S.S.G. sec. 3C1.1, App. Note 4(d). Evidence is "material" if, when believed, it tends "to influence or affect the issue under determination." U.S.S.G. sec. 3C1.1, App. Note 6. Here, who owned the business was material both to the offenses of conviction (money laundering and conspiracy to launder money), as well as the consequences of the offense as it related to relevant conduct and forfeiture. Thus, even if Baker did not succeed in obstructing justice, the district court properly enhanced his sentence for attempting to do so. See United States v. Yusufu, 63 F.3d 505, 515 (7th Cir. 1995) ("A defendant's mere attempt

to obstruct the government's case is sufficient . . . . Moreover, we believe that a finding of attempt is tantamount to a finding of willfulness. Implicit in the meaning of attempt is the will of the actor to accomplish the act attempted."); see also United States v. Gibbs, 61 F.3d 536, 539-40 (7th Cir. 1995) (attempting to shield assets from forfeiture in a bogus transaction constitutes obstruction and warrants an increase under sec. 3C1.1.).

## C. Forfeiture

As with the sentencing enhancements, the district court's factual findings regarding forfeiture are reviewed for clear error and its "determination whether the facts adduced at a forfeiture hearing constitute proper forfeiture" is reviewed de novo. See United States v. 1977 Porsche Carrera, 946 F.2d 30, 33 (5th Cir. 1991). The criminal forfeiture statute, 18 U.S.C. sec. 982(a), provides in relevant part that:

The court, in imposing sentence on a person convicted of an offense in violation of section . . . 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

(Emphasis added.)/1 The district court ordered Baker to forfeit about $ 4.4 million as proceeds that had been involved in his offenses. It arrived at this figure by focusing on the "specified unlawful activity" under the money laundering statutes. It held that the "specified unlawful activity" was Baker's prostitution business, and then added up the proceeds over the years from that business. The court also ordered Baker to forfeit the Fantasyland compound on the ground that it was financed with proceeds from the prostitution business. See Baker, 82 F. Supp.2d at 941-44. The court ordered the $4.4 million to be "FORFEITED as a personal monetary judgment" and stated "that this judgment may be enforced as a regular monetary judgment against" Baker. Id. at 944.

Similar to his argument with respect to "relevant conduct," Baker argues that the only money that is forfeitable is the $2,590 that the government proved at trial was used to obtain prostitution services. He contends that the district court erred by defining the "specified unlawful activity" as his prostitution business. According to Baker, the "specified unlawful activity" is the federal crime, not the state crime which is the predicate for the federal crime. We agree with Baker that the district

court misanalyzed the "specified unlawful activity," but not to the extent Baker would hope.

As noted, under the federal money laundering statute, 18 U.S.C. sec. 1956(a)(1)(A)(i), it is a crime to conduct a financial transaction with the proceeds of some form of "unlawful activity" with the intent to promote the carrying on of a "specified unlawful activity" if the proceeds of the transaction in fact involved the proceeds of a "specified unlawful activity." As also noted, a "specified unlawful activity" under sec. 1956(c)(7)--via 18 U.S.C. sec. 1961--can be a Travel Act violation (18 U.S.C. sec. 1952). But to violate the Travel Act, a person must use the facilities of interstate commerce to facilitate, etc. "an unlawful activity" (a state prostitution offense, for example). Here, Baker used interstate wires to facilitate a state prostitution offense which is the Travel Act violation. It is the Travel Act violation which is a "specified unlawful activity" under the money laundering statutes, not the state offense which helps identify the Travel Act violation. See Campione, 942 F.2d at 434 (discussed, supra).

To be guilty of money laundering, then, a financial transaction must not only be made up of proceeds of any "unlawful activity" (e.g., prostitution); it must also contain the proceeds of "specified unlawful activity" (e.g., credit card transactions from prostitution) with the intent to promote the carrying on of the "specified unlawful activity." See sec. 1956(a)(1)(A)(i). The district court thus erred in holding that the "specified unlawful activity" under sec. 1956 is the "unlawful activity" under the Travel Act--a state crime of prostitution. The chain of analysis that we set out in Campione confirms this, as does the fact that sec. 1956 uses both the terms "unlawful activity" and "specified unlawful activity," indicating that each has a separate meaning./2

But while Baker correctly argues that the focus of the forfeiture statute is on property involved in or traceable to the federal crime of which he was convicted (not an underlying state offense), he incorrectly asserts that this crime is the Travel Act violation and that the property is limited to the $2,590 in credit card transactions. As noted, the fifteen credit card transactions to which Baker points established that interstate wires were used to obtain prostitution services (the predicate act for the Travel Act violation); that monies from the prostitution business (the "unlawful activity") that were laundered by being deposited and

withdrawn from dummy accounts did in fact contain proceeds from credit card transactions for prostitution services (the "specified unlawful activity"); and that there were overt acts to the conspiracy. Just as the amounts of these specific credit card transactions do not limit Baker's "relevant conduct," they do not limit the amount of his property that is forfeitable.

By analogy, in United States v. Trost, 152 F.3d 715 (7th Cir. 1998), a defendant was charged with mail fraud and with eight specific acts of money laundering, totaling $23,000. The district court ordered him to forfeit $57,000-- the amount of the money laundering and the mail fraud counts. On appeal, Trost, similar to Baker, argued that he only had to forfeit the specific sums set forth in the money laundering counts. Id. at 720. We rejected this argument, noting that the district court had found that Trost's "account was used to facilitate the crimes of which Trost was convicted and that significantly more than $23,000 was funneled through the account to conceal or disguise the true nature of his activities." Id. at 721 (emphasis added). "Given those findings," we held that the amount of the forfeiture order was "well within acceptable parameters. Money does not need to be derived from the crime to be forfeited. It can be forfeited if it is involved in the crime." Id.

To arrive at the forfeitable amount here, the district court excluded any income over the years from Baker's legal sex businesses. It then concluded that Baker's income over the years from his "massage parlor" business was forfeitable because all of these funds were involved in Baker's prostitution business. As noted, the district court should not have based its analysis on the prostitution business per se. Rather, it should have based its analysis on the fact that these funds were involved in Baker's conspiracy to launder the proceeds of his prostitution business--one of the federal offenses of which he was convicted. See 18 U.S.C. sec. 982(a). In this case, however, this is a distinction without a difference.

Specifically, as with the forfeited funds in Trost, all of the funds from Baker's prostitution business over the years--both the proceeds from credit card and ATM transactions and other proceeds--were illegal, and as a result Baker laundered all of them. All of these funds were thus "involved in" the money laundering conspiracy, not just the specific credit card transactions the government proved were for prostitution services and not just the specific monies the government proved were laundered. See Trost, 152 F.3d at 721. Furthermore, the funds

that were not from credit card and ATM transactions facilitated the conspiracy by helping to further the prostitution business, and, more specifically, the use of credit card and ATM transactions in that business. In short, these funds helped "bankroll" the conspiracy. See $448,342.85, 969 F.2d at 477 ("Money need not be derived from a crime to be 'involved'; perhaps a particular sum is used as the bankroll facilitating the fraud.")./3 It would be incorrect, then, to limit the forfeiture to $2,590, as Baker contends:

Limiting the forfeiture of funds under these circumstances to the proceeds of the initial [illegal] activity would effectively undermine the purpose of the forfeiture statute. Criminal activity such as money laundering largely depends upon the use of [other] monies to advance or facilitate the scheme.

Tencer, 107 F.3d at 1135; cf. id. at 1134 ("[C]ourts have concluded that the commingling of crime proceeds with 'clean' money makes money laundering less difficult and may even be necessary to the successful completion of the offense. Such untainted funds have been found to be 'involved' for purposes of the forfeiture statute."). While the district court may have misperceived the precise focus of the proper analysis, it made the relevant findings, and its ultimate conclusion was correct. See, e.g., Baker, 82 F. Supp.2d at 942 ("Much like the accounts in Trost, here the evidence clearly established that the accounts were used to facilitate the crimes of which the defendant was convicted. By virtue of the defendant's use of these accounts, the total amount traceable to or involved in the conspiracy to commit money laundering is subject to forfeiture."). Therefore, we need not reverse or remand the issue for further findings./4

   Finally, we note that the district court ordered Baker to "forfeit" $4.4 million. He does not now have anywhere near that amount. This figure includes the income Baker generated over the years, not what he now has. Significantly, Baker does not assert on appeal that the court erred in its order to forfeit a large amount of money that he does not now have. Perhaps that is because the district court did not err by including such non-existent proceeds, cf. United States v. Ginsburg, 773 F.2d 798, 799, 801 (7th Cir. 1985) (en banc) ("The government's right to forfeit the profits or proceeds of racketeering activity under section 1963(a)(1) is therefore not limited to whatever is left over or unspent at the time of the conviction, but instead includes the entire amount that was acquired by the defendant in

violation of RICO."). Perhaps also the government can satisfy part of the forfeiture award with assets "traceable to" proceeds of Baker's conspiracy, or with substitute assets. See 21 U.S.C. sec. 853p; United States v. Hendrickson, 22 F.3d 170, 175 (7th Cir. 1994). At the forfeiture hearing, though, the government noted that whatever assets were recovered would be far short of the forfeiture award.

The district court also stated that the government could enforce its forfeiture award against Baker as a regular in personam judgment. This was proper, too. See United States v. Candelaria-Silva, 166 F.3d 19, 42 (1st Cir. 1999) ("A criminal forfeiture order may take several forms. First, the government is entitled to an in personam judgment against the defendant for the amount of money the defendant obtained as proceeds of the offense."); accord United States v. Voigt, 89 F.3d 1050, 1084 (3d Cir. 1996); United States v. Lester, 85 F.3d 1409, 1413 (9th Cir. 1996). In effect this places a judgment lien against Baker for the balance of his prison term and beyond. See Voigt, 89 F.3d at 1086 n. 21; cf. United States v. $814,254.76, 51 F.3d 207, 211 (9th Cir. 1995) ("[T]he substitute assets provision of the criminal forfeiture statute is merely another mechanism for collecting a judgment against the defendant criminal . . . ."). Because Baker does not assign this as an error, we do not reach the question of whether this constitutes an excessive fine or causes some other injury.

III.  Conclusion

Because the indictment did not make the commission of acts of prostitution material to the money laundering and conspiracy counts, it is not "plainly obvious" that the indictment was constructively amended when the district court charged the jury that it need not find that an act of prostitution accompanied each credit card transaction that was presented to obtain prostitution services, or when the government made similar statements during closing argument. Furthermore, the district court did not clearly err in including as relevant conduct the proceeds from Baker's prostitution business over the years as monies "involved in" the conspiracy because they furthered and facilitated the money laundering conspiracy. The district court also did not clearly err in enhancing Baker's offense level for leading five or more people in the conspiracy and for attempting to obstruct justice by transferring ownership of his businesses to his son. Finally, because the millions of dollars that Baker generated from his prostitution

business over the years facilitated his money laundering conspiracy, the district court did not clearly err in including these proceeds in its forfeiture order as monies "involved in" Baker's offense.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

/1 By incorporating 21 U.S.C. sec. 853, see 18 U.S.C. sec. 982(b)(1), the criminal forfeiture statute allows the government to obtain "substitute assets" if it cannot find property "involved in" or "traceable to" the offense for which a defendant was convicted. See 21 U.S.C. sec. 853p.

/2 The district court based its conclusion on the following passage from Montague: "[T]he Missouri prostitution statute forms the basis for a violation of sec. 1952, which is a type of racketeering activity listed in sec. 1961, and is a specified unlawful activity designated in the money laundering statute--sec.1956." Baker, 82 F. Supp.2d at 941 (quoting 29 F.3d at 322). Baker notes that this passage from Montague is at the end of a long quotation from Campione, which discusses the fact that the Travel Act violation is using the means of interstate commerce to facilitate a state crime, not the underlying state crime. Like Baker, then, we read this passage from Montague to mean that while a state prostitution statute "forms the basis for a violation" of the Travel Act, it is the "racketeering activity listed in sec. 1961"--the Travel Act violation itself--that is the "specified unlawful activity designated in the money laundering statute."

/3 In this regard, the Fantasyland compound is clearly forfeitable. Not only did the ATM and credit card transactions occur on the premises; the conspiracy was obviously run from this compound. As the key to Baker's operation, it was obviously "involved in" the conspiracy.

/4 Because the district court excluded the proceeds from Baker's other businesses from its forfeiture calculation, and the government does not cross-appeal this exclusion, we need not address whether the district court was required to make this exclusion (at the forfeiture hearing, the court indicated that it did not think it was). We note, however, that even legitimate funds that are commingled with illegitimate funds can be forfeited if the legitimate funds were somehow involved in the offense, such as by helping to conceal the illegal funds. See Tencer, 107 F.3d at 1134.